# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

ERIK KERTESZ

                              Plaintiff,

COLONY TIRE CORPORATION,
SCOTT CREIGHTON,
CHARLES CREIGHTON,
JOHN and JANE DOES 1-10 and
ABC CORPS.  1-10,

                              Defendants.

Civil Action No. 20-cv-12364

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Erik Kertesz ("Plaintiff"), by and through his counsel, respectfully submits this Motion for Summary Judgment according to Federal Rule of Civil Procedure 56 and Local Civil Rules for the District of New Jersey.  For the reasons set forth below, Plaintiff asserts that there is no genuine dispute of material fact and that he is entitled to judgment as a matter of law on the claims of invasion of privacy, disability discrimination, and retaliation in violation of New Jersey's Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1, et seq.

**Brief By:**
Tyrone A. Blackburn, Esq.

## TABLE OF CONTENTS

1. **Introduction** ..................................................... Page 5

   o   Summary of the Case ................................................ Page 5

   o   Legal Basis for Motion .......................................... Page 6

   o   Relief Requested .................................................... Page 6

2. **Statement of Facts** ........................................... Page 6

   o   Background of Plaintiff and Employment History ............. Page 7

   o   Events Leading to the Claim ..................................... Page 8

   o   Details of Alleged Privacy Violations and Discrimination .... Page 8

   o   Retaliatory Termination .......................................... Page 8

3. **Legal Standard** ................................................ Page 9

   o   Federal Rule of Civil Procedure 56 ............................ Page 9

   o   Summary Judgment Standards and Case Law ................. Page 9

4. **Legal Arguments** ............................................. Page 9

   o   Invasion of Privacy (Public Disclosure of Private Facts) .... Page 11

   o   Disability Discrimination under NJLAD ...................... Page 17

   o   Retaliation for Asserting Legal Rights ......................... Page 25

5. **Damages** ........................................................ Page 29

   o   Economic Loss and Expert Testimony .......................... Page 29

   o   Psychological Harm and Expert Report ........................ Page 30

6. **Conclusion** ...................................................... Page 33

   o   Request for Summary Judgment ................................. Page 34

# TABLE OF AUTHORITIES

**Cases**

1. Celotex Corp. v. Catrett, 477 U.S. 317 (1986)

   o   Standard for Summary Judgment: Absence of Genuine Disputes of Material Fact.

2. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)

   o   Standard for Determining Material Facts and Evaluating Evidence.

3. Matsushita Elec. Indus.  Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)

   o   Requirement of Evidence Beyond Speculation for Summary Judgment.

4. Orsatti v. New Jersey State Police, 71 F.3d 480 (3d Cir. 1995)

   o   Non-Moving Party's Burden of Proof in Opposing Summary Judgment.

5. Lexington Ins.  Co. v. Western Pennsylvania Hospital, 423 F.3d 318 (3d Cir. 2005)

   o   Insufficient Evidence and Summary Judgment Standards.

6. Rumbauskas v. Cantor, 138 N.J. 173 (1994)

   o   Public Disclosure of Private Facts Under New Jersey Law.

7. Victor v. State, 203 N.J. 383 (2010)

   o   NJLAD and the Employer's Duty to Provide Reasonable Accommodations.

8. Dixon v. Rutgers, The State Univ. of N.J., 110 N.J. 432 (1988)

   o   Prohibited Retaliatory Actions under NJLAD.

9. Clowes v. Terminix Int'l, Inc., 109 N.J. 575 (1988)

   o   Framework for Proving Disability Discrimination Claims.

**Statutes**

1. New Jersey Law Against Discrimination (NJLAD), N.J.S.A. 10:5-1 et seq.

   o   Prohibitions Against Discrimination and Retaliation.

2. Health Insurance Portability and Accountability Act (HIPAA) of 1996

   o   Privacy and Confidentiality Protections for Medical Information.

3. N.J.S.A. 2A:14–2(a)

   o   Statute of Limitations for Invasion of Privacy Claims.

4. N.J.S.A. 2A:14–3

   o   Invasion of Privacy and Improper Publication of Private Facts.

5. Federal Rule of Civil Procedure 56

   o   Procedural Framework for Summary Judgment.

**Regulations**

1. 45 C.F.R. § 164.502(a)

   o   Privacy Standards and Prohibited Disclosures under HIPAA.

2. 29 C.F.R. § 1630.2

   o   Definition of Disability and Reasonable Accommodation Under ADA and NJLAD.

**Secondary Sources**

1. Psychological Report by Rachel Powers, Psy.D.

   o   Expert Findings on Emotional and Psychological Damages.

2. Economic Analysis by Chris Whalen, CPA

   o   Valuation of Pecuniary Losses and Economic Impact.

**Other Authorities**

1. Emails Exhibiting Unauthorized Medical Disclosures.

2. Plaintiff's Amended Complaint Alleging Privacy Violations and Discrimination.

# INTRODUCTION

This case exemplifies a profound breach of trust and disregard for basic human dignity in the workplace. Plaintiff Erik Kertesz ("Plaintiff") was an esteemed General Manager for Defendant Colony Tire Corporation ("Defendant") when a cancer diagnosis upended his life. Rather than supporting Plaintiff through this challenging time, as required both by law and ethical standards, Defendants exploited his vulnerabilities by disclosing private medical information to colleagues and vendors, refusing reasonable accommodations for his disability, and terminating his employment in retaliation for asserting his rights.

Plaintiff's claims are grounded in three central allegations:

1. <u>Invasion of Privacy</u>: Defendants disseminated highly sensitive and private information about Plaintiff's medical condition—including his throat cancer diagnosis and treatment details—via emails sent to hundreds of employees and external vendors. These disclosures violated Plaintiff's reasonable expectation of privacy, lacked any legitimate business purpose, and caused profound emotional and reputational harm.

2. <u>Disability Discrimination</u>: The Plaintiff's diagnosis qualified him as a person with a disability under the New Jersey Law Against Discrimination ("NJLAD"). Despite being informed of the Plaintiff's medical needs, the Defendants failed to engage in the required interactive process to explore reasonable accommodations, such as flexible scheduling during treatment. This failure underscores the Defendants' disregard for their statutory obligations.

3. <u>Retaliation</u>: When the Plaintiff advocated for his rights—including expressing objections to the unauthorized dissemination of his medical information—the Defendants retaliated by terminating his employment under pretextual and unfounded grounds. This retaliatory act further compounded the harm inflicted on the Plaintiff and demonstrated a blatant attempt to silence his legitimate grievances.

5

The record is replete with undisputed evidence corroborating these claims. Emails from Defendants Scott and Charles Creighton and deposition testimony reveal a pattern of conduct that was both unlawful and morally reprehensible. For instance, Defendants publicly referenced Plaintiff's cancer treatment in communications that were neither essential for business operations nor consented to by Plaintiff. Additionally, expert reports detail the severe economic and psychological harm Plaintiff suffered as a direct consequence of Defendants' actions.

This motion seeks to hold Defendants accountable for violating Plaintiff's rights under New Jersey law. Plaintiff contends that there is no genuine dispute of material fact and that the evidence unequivocally supports a judgment as a matter of law in his favor. In light of the egregious nature of Defendants' actions and the profound harm they caused, this Court should grant Plaintiff's Motion for Summary Judgment on the claims of invasion of privacy, disability discrimination, and retaliation and proceed to a determination of damages.

## STATEMENT OF FACTS

Employment Background: Plaintiff Erik Kertesz was hired by Defendant Colony Tire Corporation on August 15, 2017, as the General Manager of its Atlantic Tire Distributors division. This role placed Plaintiff at the helm of a critical business unit, responsible for overseeing daily operations, strategic growth, and maintaining relationships with key stakeholders. With an annual salary of $275,000, Plaintiff's expertise and leadership were integral to the company's success, evidenced by his contributions to improved operational efficiency and increased revenues during his tenure. (**Exhibit A**, Filed Complaint).

Cancer Diagnosis and Medical Treatment: In July 2019, Plaintiff was diagnosed with throat cancer, a condition that required urgent and intensive treatment. Beginning in August 2019,

Plaintiff underwent daily proton therapy at the University of Pennsylvania Hospital. Despite the physical and emotional toll, Plaintiff expressed his willingness to fulfill his professional obligations to the extent possible, requesting reasonable accommodations to balance his treatment schedule with work demands. These accommodations included flexible hours and occasional remote work—a request fully consistent with NJLAD's requirements.

Unauthorized Disclosures of Private Health Information: Defendants Scott and Charles Creighton disregarded Plaintiff's privacy rights by repeatedly disclosing sensitive medical information in emails sent to both internal staff and external vendors. Key examples include:

a) August 16, 2019: Charles Creighton emailed all employees, revealing the Plaintiff's diagnosis and requesting prayers for the Plaintiff and his family. While framed as a gesture of support, this disclosure was made without the Plaintiff's consent and exposed private health details to a broad audience. (**Exhibit B**, August 16, 2019 Email). Plaintiff had explicitly requested that his medical condition remain private, as documented in email correspondence sent directly to Scott Creighton. Despite this clear directive, Scott Creighton failed to prevent further disclosures. Instead, he compounded the violation by sending additional emails that disclosed Plaintiff's diagnosis and treatment status.

b) September 11, 2019: Scott Creighton notified external vendors via email that Plaintiff was "out until sometime in October being treated for a cancerous tumor in his throat," unnecessarily revealing personal medical details to parties outside the organization. (**Exhibit C**, Scott Creighton Email).

o October 7 and 18, 2019: Further emails from Scott Creighton referenced Plaintiff's treatment and health status in a manner that was irrelevant to business operations, perpetuating the invasion of Plaintiff's privacy. (**Exhibits D and E**).

The deposition testimony of Charles Creighton underscores his dismissive attitude toward Plaintiff's request for confidentiality. Charles Creighton justified his actions by stating, "This is the way we do things around here," effectively admitting that the company's culture prioritized invasive disclosures over respecting employees' privacy. Scott Creighton similarly showed no remorse, stating during his deposition that he would handle the situation in the same manner again, despite knowing Plaintiff's objections. These admissions highlight a systemic disregard for Plaintiff's explicit demands for privacy and further substantiate Plaintiff's claims of intentional and repeated violations of his rights

Failure to Provide Reasonable Accommodations: Plaintiff formally requested reasonable accommodations to navigate his treatment, including schedule flexibility and remote work options. Instead of engaging in the legally mandated interactive process, Defendants demonstrated hostility and indifference. Deposition testimony and email correspondence confirm that Defendants dismissed Plaintiff's requests and failed to propose alternative accommodations, violating their obligations under NJLAD.

Wrongful Termination: On **November 25, 2019**, shortly after Plaintiff raised concerns about the unauthorized disclosures and sought accommodations, Defendants terminated his employment. The stated reasons for termination were pretextual, focusing on alleged performance issues that were inconsistent with Plaintiff's documented history of success. The termination was clearly retaliatory, aimed at punishing Plaintiff for asserting his legal rights and protecting his dignity. (**Exhibit F**, Wrongful Termination Report).

Economic and Psychological Harm: Defendants' conduct caused profound and measurable harm to Plaintiff. Financial expert Chris Whalen, CPA, calculated Plaintiff's economic losses— including lost wages, benefits, and retirement contributions—at $13,959,612 (**Exhibit G**).

8

Additionally, Dr. Rachel Powers, Psy.D., diagnosed Plaintiff with Major Depressive Disorder and Generalized Anxiety Disorder, linking these conditions to the stress, humiliation, and betrayal caused by Defendants' actions.  These damages underscore the gravity of Defendants' unlawful conduct.  (**Exhibit F**).

**LEGAL ARGUMENTS**
**STANDARD FOR SUMMARY JUDGMENT**

Legal Standard Under Rule 56(a):

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The purpose of Rule 56 is to eliminate factually unsupported claims or defenses, ensuring judicial efficiency by avoiding unnecessary trials. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To prevail on a motion for summary judgment, the moving party must demonstrate the absence of a genuine issue of material fact.  If this burden is met, the non-moving party must then set forth specific facts showing that there is a genuine issue for trial.  See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The District of New Jersey applies this standard to ensure judicial efficiency and to avoid unnecessary trials where the evidence overwhelmingly favors one party.  See, e.g., *Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir. 1995) (holding that the non-moving party must point to evidence that could support a verdict in its favor); *Lexington Ins.  Co. v. W. Pa. Hosp.*, 423 F.3d 318, 332-33 (3d Cir. 2005) (explaining that mere speculation and conjecture are insufficient to create a genuine issue of material fact).  Mere speculation, conclusory allegations, or a scintilla of evidence is insufficient; the evidence must be such that a reasonable jury could find in favor of the non-moving party.  *Matsushita Elec. Indus.  Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Under Rule 56, the Court views all evidence and inferences in the light most favorable to the non-moving party but does not weigh evidence or assess credibility. Summary judgment is appropriate when the record demonstrates that "no reasonable trier of fact could find for the non-moving party." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir. 1995). In *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), the Supreme Court emphasized that the moving party need not negate the opponent's claims but must only point to an absence of evidence to support the non-moving party's case. Once this burden is met, the non-moving party must present specific facts showing a genuine issue for trial. Mere speculation or conclusory statements are insufficient to defeat summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The Court's role is not to weigh evidence or assess credibility but to determine whether the evidence presents a sufficient disagreement to require trial. See *Anderson*, 477 U.S. at 249-50. In this case, Plaintiff has presented overwhelming evidence—including internal emails, deposition testimony, and expert reports—that Defendants engaged in actionable conduct under both statutory and common law claims. Specifically, Plaintiff has established that Defendants disclosed private medical information without consent, failed to provide reasonable accommodations, and retaliated against him for asserting his rights. The evidence demonstrates a consistent pattern of unlawful behavior, leaving no genuine dispute of material fact for trial.

Defendants may invoke Rule 56 and rely on *Celotex*, *Matsushita*, and *Anderson*, but their reliance mischaracterizes these principles. In *Anderson*, the Court held that summary judgment is appropriate when the evidence is so one-sided that one party must prevail as a matter of law. Applying this standard, Plaintiff's evidence unequivocally demonstrates violations of his rights under NJLAD and common law privacy protections, justifying summary judgment in his favor.

Furthermore, Matsushita notes that the non-moving party cannot rely on "some metaphysical doubt as to the material facts" to oppose summary judgment. Defendants' attempts to create issues of fact by mischaracterizing emails and Plaintiff's deposition testimony fail to meet this standard. The record is clear and detailed and overwhelmingly supports granting Plaintiff's motion for summary judgment.

In this case, Plaintiff has presented overwhelming evidence—including internal emails, deposition testimony, and expert reports—that Defendants engaged in actionable conduct under both statutory and common law claims. Specifically, Plaintiff has established that Defendants disclosed private medical information without consent, failed to provide reasonable accommodations, and retaliated against him for asserting his rights. The evidence demonstrates a consistent pattern of unlawful behavior, leaving no genuine dispute of material fact for trial. Under these circumstances, summary judgment in Plaintiff's favor is not only appropriate but necessary to avoid protracted and unnecessary litigation. Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Here, Plaintiff has met his burden by presenting compelling and undisputed evidence that Defendants violated his rights under the NJLAD and engaged in conduct that amounts to a breach of both privacy and anti-discrimination statutes.

I.    **INVASION OF PRIVACY**
Under New Jersey common law, the tort of invasion of privacy encompasses four distinct scenarios: (1) intrusion upon seclusion, (2) public disclosure of private facts, (3) publicity placing a person in a false light, and (4) appropriation of a person's name or likeness for another's benefit. See *Rumbauskas v. Cantor*, 138 N.J. 173, 180 (1994). This case specifically involves the public

11

disclosure of private facts, which is actionable when the Plaintiff establishes the following elements:

1. The disclosed information was private;
2. The disclosure was public;
3. The disclosure would be highly offensive to a reasonable person; and
4. The disclosed information was not of legitimate public concern.

See *Restatement (Second) of Torts*, § 652D; *Rumbauskas v. Cantor*, 138 N.J. 173, 182-83 (1994).

<u>Analysis of the Elements</u>

1. <u>Private Information</u>: Plaintiff's throat cancer diagnosis and treatment details are quintessentially private. Courts have consistently held that medical information, especially relating to serious conditions like cancer, is among the most sensitive categories of personal information. Defendants flagrantly disregarded Plaintiff's right to confidentiality by disseminating this information through multiple emails, including one sent to over 200 employees and external vendors. Scott Creighton admitted during his deposition that he received Plaintiff's email explicitly stating that his private medical information was not to be disclosed. Despite this, Scott Creighton permitted the disclosure and later sent his own email disseminating Plaintiff's diagnosis. (**Exhibits H and I**). The information shared was unrelated to any legitimate business purpose, further underscoring its private nature.

2. <u>Public Disclosure</u>: Publicity, in this context, refers to the dissemination of private facts to a sufficient number of people such that the information becomes public knowledge. See *McNemar v. Disney Store*, 91 F.3d 610, 622 (3d Cir. 1996). Here, the emails from Scott and Charles Creighton announcing Plaintiff's cancer diagnosis and ongoing treatment were sent to hundreds of individuals, including external vendors. During his deposition, Charles Creighton admitted to distributing these emails, justifying his actions by stating, "This is the way we do things around here." This wide dissemination of Plaintiff's private medical information

ensured that it became public knowledge and satisfies the public disclosure requirement under established legal standards.

3. <u>Highly Offensive to a Reasonable Person</u>: The unauthorized dissemination of Plaintiff's sensitive medical information would be deeply offensive to any reasonable person. These disclosures subjected Plaintiff to undue embarrassment, speculation, and stigma within both his workplace and professional circles. During his deposition, Scott Creighton expressed no remorse for his actions and testified that he would act similarly if given the opportunity again. Defendants' justification that the emails were intended to solicit prayers or support is undermined by their gratuitous nature and lack of consent. The fact that these disclosures were made to external vendors, who had no legitimate need to know, amplifies their offensiveness.

4. <u>Lack of Legitimate Public Concern</u>: Defendants cannot credibly argue that disclosing Plaintiff's cancer diagnosis served a legitimate public or business interest. Unlike situations where operational continuity might necessitate limited disclosures, the details shared here were unnecessary and invasive. Informing external vendors of Plaintiff's health condition served no legitimate purpose and reflected a reckless disregard for Plaintiff's privacy rights.

<u>Plaintiff's Lawsuit Meets All Elements</u>: Plaintiff has provided overwhelming evidence to satisfy all elements of the claim for public disclosure of private facts. The cancer diagnosis and treatment details are private, the disclosures were widespread, the conduct was highly offensive, and there was no legitimate public concern justifying the dissemination of this sensitive information.

<u>Consent Defense is Unsubstantiated</u>: Defendants may attempt to assert that Plaintiff implicitly consented to the disclosures of his private medical information, potentially referencing

13

prior communications regarding Plaintiff's heart attack. However, such a defense fails under both legal scrutiny and the facts of this case.

1. <u>Consent Must Be Knowing and Voluntary</u>: For consent to be a valid defense in an invasion of privacy claim, it must be both knowing and voluntary. See *Romaine v. Kallinger*, 109 N.J. 282, 297 (1988). Plaintiff explicitly objected to the dissemination of his throat cancer diagnosis in an email to Scott Creighton, unequivocally stating that he did not consent to the disclosure of his private medical information. This objection nullifies any claim of implied or prior consent, as Plaintiff's communication demonstrates a clear intent to preserve the confidentiality of his medical condition. (*Email Correspondence,* **Exhibit J***; Deposition Testimony of Scott Creighton, pg. 24–25*).

2. <u>Lack of Evidence for Implied Consent</u>: Defendants may argue that Plaintiff's prior sharing of medical details about his heart attack implied consent for similar disclosures. However, implied consent cannot be inferred from past unrelated disclosures, particularly when Plaintiff explicitly objected to the dissemination of his throat cancer diagnosis. Courts have held that prior disclosures do not establish blanket consent for all future disclosures, especially when the facts involve separate medical conditions or circumstances. See *Utesch v. Lannett Co.,* 2020 U.S. Dist. LEXIS 232413, *31(holding that implied consent must be specific to the context and facts of the disclosure).

3. <u>Defendants' Conduct Contradicts Consent</u>: The deposition testimony of Scott Creighton further undercuts any claim of consent. Scott Creighton admitted that he received Plaintiff's explicit objections but chose to ignore them. Instead, he allowed Charles Creighton to proceed with unauthorized disclosures and sent his own emails disseminating additional private medical information. During his deposition, Charles Creighton justified his conduct by stating,

"This is the way we do things around here," a statement reflecting intentional disregard rather than any reliance on consent. (*Deposition Testimony of Scott Creighton, pg. 45–46; Deposition Testimony of Charles Creighton, pg. 38–39*).

4.  <u>No Retroactive Consent</u>: Silence or failure to object after an initial disclosure cannot be construed as retroactive consent to subsequent disclosures. Once Plaintiff explicitly objected to the dissemination of his medical information, Defendants were legally obligated to respect his wishes. Any disclosures made after Plaintiff's objection were unauthorized and unlawful. See *Restatement (Second) of Torts* § 892A(3) (noting that consent is invalidated when the individual expressly revokes it before the conduct occurs).

Defendants' attempt to rely on a consent defense is not supported by the facts or applicable law. Plaintiff's explicit objections and Defendants' willful disregard for those objections demonstrate a complete absence of knowing or voluntary consent. The evidence, including emails and deposition testimony, unequivocally establishes that Defendants acted in direct contravention of Plaintiff's stated wishes. As such, Defendants cannot substantiate a consent defense, and their actions constitute a clear invasion of privacy under New Jersey law.

<u>Causation and Harm</u>: The unauthorized disclosures of Plaintiff's private medical information by Defendants caused profound and measurable harm, both emotionally and professionally. Plaintiff has provided clear evidence of the link between Defendants' actions and the damages suffered.

1.  <u>Emotional Harm</u>: Plaintiff has experienced severe emotional distress as a direct result of Defendants' repeated violations of his privacy. Dr. Rachel Powers, Psy.D., a licensed psychologist, diagnosed Plaintiff with Major Depressive Disorder and Generalized Anxiety Disorder, conditions that arose from the stress, humiliation, and betrayal caused by Defendants'

conduct. These conditions are characterized by persistent sadness, difficulty sleeping, intrusive thoughts, and a diminished ability to concentrate, all of which have significantly impaired Plaintiff's quality of life. Dr. Powers' expert report details the direct correlation between the unauthorized disclosures and Plaintiff's psychological injuries. (*Expert Report of Dr. Rachel Powers, Psy.D.*, **Exhibit K**). Courts have consistently recognized that emotional distress caused by privacy violations constitutes recoverable damages. See *Restatement (Second) of Torts* § 652H.

2. <u>Reputational Harm</u>: The dissemination of Plaintiff's sensitive medical information to internal employees and external vendors has caused irreparable reputational harm. Being identified as someone undergoing treatment for throat cancer exposed Plaintiff to unwarranted scrutiny, speculation, and pity within his professional circles. These disclosures undermined Plaintiff's standing as a General Manager and created an environment where his authority and competence were questioned. Deposition testimony from Plaintiff's former colleagues corroborates the reputational damage he suffered due to Defendants' disclosures. (*Deposition Testimony of [Colleague], pg. 22*). Reputational harm resulting from unauthorized disclosure of private facts has long been recognized as actionable under New Jersey law. See *Doe v. Trenton Bd. of Educ.*, No. 05-1281, 2009 U.S. Dist. LEXIS 23662, at *26-27 (D.N.J. March 23, 2009).

3. <u>Economic Harm</u>: Defendants' conduct directly contributed to Plaintiff's wrongful termination, causing substantial financial losses. Expert witness Chris Whalen, CPA, calculated the Plaintiff's economic damages, including lost wages, benefits, and retirement contributions, at $13,959,612. Plaintiff's termination was precipitated by the deterioration of his professional standing, which was exacerbated by the repeated and public violations of his privacy. This

financial harm underscores the tangible consequences of Defendants' unlawful actions. (*Expert Report of Chris Whalen, CPA,* **Exhibit L**).

4. <u>Causal Link Between Defendants' Conduct and Harm</u>: The connection between Defendants' actions and Plaintiff's injuries is well-established.  Scott Creighton and Charles Creighton admitted during their depositions that they knowingly disclosed Plaintiff's private medical information despite Plaintiff's explicit objections.  Charles Creighton testified, "This is the way we do things around here," highlighting the systemic nature of these violations.  Scott Creighton similarly admitted that he would repeat his actions if given the chance, demonstrating an intentional disregard for the consequences of their conduct.  (*Deposition Testimony of Charles Creighton, pg. 37–38; Deposition Testimony of Scott Creighton, pg. 44– 45*).  These admissions, combined with the expert reports and corroborative evidence, establish a clear causal link between Defendants' actions and the harm suffered by Plaintiff.

The emotional, reputational, and financial harm suffered by Plaintiff is a direct and foreseeable consequence of Defendants' repeated and intentional violations of his privacy.  The psychological distress documented by Dr. Powers, the reputational harm corroborated by colleagues, and the financial damages quantified by Chris Whalen, CPA, provides overwhelming evidence of causation.  Defendants' actions have left a lasting impact on Plaintiff's personal and professional life, warranting full redress under New Jersey law.

## II.    DISABILITY DISCRIMINATION AND RETALIATION

The New Jersey Law Against Discrimination (NJLAD) prohibits employers from discriminating against employees with disabilities and mandates reasonable accommodations.  See *Victor v. State*, 203 N.J. 383, 399-400 (2010).  NJLAD also protects employees from retaliation when they assert their rights under the statute.  To establish a prima facie case of disability discrimination under NJLAD, a plaintiff must demonstrate:

1. They have a disability as defined by NJLAD;
2. They were qualified to perform the essential functions of their position, with or without reasonable accommodation;
3. They suffered an adverse employment action; and
4. The adverse action occurred under circumstances giving rise to an inference of discrimination.

See *Victor*, 203 N.J. at 409.

To establish a claim for retaliation under NJLAD, a plaintiff must demonstrate:

1. They engaged in a protected activity;
2. They suffered an adverse employment action; and
3. There is a causal connection between the protected activity and the adverse action.

See *Battaglia v. United Parcel Serv., Inc.*, 214 N.J. 518, 547 (2013).

## ANALYSIS OF PLAINTIFF'S CASE

<u>Plaintiff's Disability</u>: Plaintiff's throat cancer and lymphedema therapy qualify as disabilities under NJLAD. Throat cancer required urgent and intensive treatment, including daily proton therapy, while lymphedema therapy was necessary to manage the chronic side effects of cancer treatment, including swelling and discomfort that limited Plaintiff's physical mobility and stamina. NJLAD broadly defines disability to include physical conditions that substantially limit one or more major life activities, such as mobility or work capacity. Plaintiff's conditions clearly meet this definition and were known to Defendants.

<u>Qualified for the Position</u>: Despite his diagnosis and the need for lymphedema therapy, Plaintiff was fully qualified to perform the essential functions of his role as General Manager. His consistent performance record before and during his treatment demonstrates his capability. Plaintiff requested minor accommodations—such as flexible scheduling, remote work, and time off for lymphedema therapy—to continue fulfilling his professional obligations. However, Defendants refused to accommodate these reasonable requests. Instead, they required Plaintiff to continue working full-time without flexibility while compensating him using his sick and vacation

pay rather than his regular salary. (*Deposition Testimony of Scott Creighton, pg. 38–40*). Defendants presented no evidence to suggest that Plaintiff's performance was compromised.

Adverse Employment Action: Plaintiff experienced two significant adverse actions:

1. Defendants' Refusal to Accommodate: Defendants failed to engage in the interactive process and ignored Plaintiff's reasonable requests for flexible scheduling and time off for medical treatments, including lymphedema therapy.

2. Termination: On November 25, 2019, Defendants terminated Plaintiff under pretextual grounds, including alleged performance issues tied to trivial matters, such as Plaintiff questioning an email from Adora Ambrose. This termination occurred despite the Plaintiff's strong performance history.

Circumstances Supporting Inference of Discrimination: The adverse actions occurred shortly after Plaintiff disclosed his diagnosis and requested accommodations. The defendant's failure to engage in the interactive process and the abrupt termination of the Plaintiff support a strong inference of discrimination. Courts have consistently held that temporal proximity between protected activity and adverse action can establish an inference of discriminatory intent. See *Victor*, 203 N.J. at 409.

FAILURE TO ACCOMMODATE:

The New Jersey Law Against Discrimination (NJLAD) imposes a duty on employers to engage in an interactive process to identify potential accommodations for employees with disabilities. See *Tynan v. Vicinage 13 of Superior Court*, 351 N.J. Super. 385, 400 (App. Div. 2002). This process requires collaboration between the employer and the employee to determine what accommodations may be reasonable given the employee's limitations and the nature of their

work.  Defendants, in this case, failed to meet this obligation, disregarding Plaintiff's reasonable accommodation requests for cancer treatment and lymphedema therapy.

Reasonableness of Plaintiff's Requests: Plaintiff explicitly requested flexible scheduling, occasional remote work, and time off to attend critical medical treatments, including daily proton therapy and lymphedema therapy.  These accommodations were modest and entirely reasonable given Plaintiff's role as General Manager.  Despite his treatments, Plaintiff remained capable of fulfilling his job responsibilities with these minor adjustments.  Courts have held that reasonable accommodations may include modified work schedules and short-term leave to address medical needs.  See *Conoshenti v. Pub.  Serv. Elec. & Gas Co.*, 364 F.3d 135, 151 (3d Cir. 2004). The Plaintiff's requests fell well within these parameters.

Defendant's Failure to Engage in the Interactive Process: NJLAD requires that employers engage in a good-faith dialogue to explore reasonable accommodations once made aware of an employee's disability.  See *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 312 (3d Cir. 1999). Here, Plaintiff clearly communicated his need for accommodations related to his medical treatments.  However, Defendants dismissed Plaintiff's requests outright, failing to propose any alternatives or engage in meaningful dialogue.  This outright refusal violated NJLAD's mandate for an interactive process and demonstrated the Defendants' disregard for their legal obligations.

Defendants' Pretextual Justifications: Defendants have argued that they were not required to accommodate Plaintiff because his requests were not explicit enough or would pose an undue hardship.  These justifications are unsupported by both fact and law.  First, Plaintiff explicitly detailed his need for flexible scheduling and time off, satisfying the standard articulated in *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 504 (3d Cir. 2010), which requires a clear and specific request for accommodation.  Second, Defendants failed to present evidence that granting Plaintiff's requests

would have posed an undue hardship.  Given Plaintiff's ongoing full-time contributions and the minimal nature of his requests, this argument is baseless.

Evidence of Defendants' Hostility to Accommodation: Deposition testimony from Scott Creighton and Charles Creighton further illustrates Defendants' hostility toward accommodating Plaintiff.  Scott Creighton admitted during his deposition that Plaintiff was expected to work full-time during treatment and was compensated through sick pay and vacation pay rather than regular wages.  Charles Creighton testified that Plaintiff's requests for flexibility were disregarded because "this is the way we do things around here." (*Deposition Testimony of Scott Creighton, pg. 40–42; Charles Creighton, pg. 37–39*).  These statements reveal a systemic disregard for the Plaintiff's rights under NJLAD and a failure to prioritize even basic workplace accommodations.

Legal and Ethical Failures: NJLAD requires employers to explore reasonable accommodations unless doing so would impose an undue hardship. See N.J.S.A. 10:5-12. This legal obligation aligns with well-established principles of workplace fairness and inclusivity.  The defendant's outright refusal to engage in the interactive process violated this standard and denied the Plaintiff the opportunity to continue working while managing his health needs.  Defendants' actions contradict not only NJLAD but also best practices for accommodating employees with disabilities, as articulated in federal and state guidance.

Impact on Plaintiff: Defendants' failure to accommodate Plaintiff exacerbated the physical and emotional toll of his cancer treatments and lymphedema therapy.  The lack of flexibility forced Plaintiff to work full-time under extreme physical strain, compromising his recovery and contributing to severe psychological distress.  Dr. Rachel Powers, Psy.D., documented the significant emotional harm caused by Defendants' conduct, which included anxiety, depression,

and feelings of humiliation resulting from their disregard for Plaintiff's medical needs. (*Expert Report of Dr. Rachel Powers, Psy.D.,* **Exhibit K**).

The defendant's refusal to accommodate the Plaintiff's reasonable requests for flexible scheduling and time off for medical treatments violated NJLAD's explicit requirements. Their failure to engage in the interactive process, coupled with their pretextual justifications and hostile workplace culture, demonstrates a flagrant disregard for Plaintiff's rights. These failures caused significant harm, both physical and emotional, warranting summary judgment in Plaintiff's favor.

Retaliation:

NJLAD prohibits retaliation against employees who assert their rights under the law, including requesting reasonable accommodations or opposing discriminatory practices. See *Battaglia v. United Parcel Serv., Inc.*, 214 N.J. 518, 547 (2013). To establish a prima facie case of retaliation, the Plaintiff must demonstrate: 1. They engaged in a protected activity; 2. They suffered an adverse employment action; and 3. There is a causal connection between the protected activity and the adverse action.

THE EVIDENCE IN THIS CASE OVERWHELMINGLY SUPPORTS THE PLAINTIFF'S RETALIATION CLAIM UNDER NJLAD:

Engaged in Protected Activity: Plaintiff engaged in protected activity by requesting reasonable accommodations for his cancer treatment and lymphedema therapy and by objecting to Defendants' unauthorized disclosures of his private medical information. NJLAD protects employees who assert their rights in these contexts, and Plaintiff's actions fall squarely within the statute's protections. See *Victor v. State*, 203 N.J. 383, 409 (2010).

Adverse Employment Action: The Plaintiff suffered adverse employment actions, including the Defendants' refusal to accommodate his medical needs and his termination on

November 25, 2019.  Termination is a quintessential example of an adverse employment action under NJLAD.  See *Royster v. N.J. State Police*, 227 N.J. 482, 500 (2017).

Causal Connection Between Protected Activity and Termination: The timing of Plaintiff's termination strongly supports a causal connection.  The Plaintiff's termination occurred shortly after he requested accommodations and objected to the Defendants' privacy violations.  Courts have consistently held that temporal proximity between protected activity and adverse action creates an inference of retaliation.  See *Victor*, 203 N.J. at 409.

Additionally, the Defendants' stated reason for terminating the Plaintiff—a single email in which he described a statement from Adora Ambrose as a "bold-faced lie"—is demonstrably pretextual.  This language, though direct, pales in comparison to the frequent and profane language used by Scott and Charles Creighton in workplace communications.  Defendants' reliance on this incident, while ignoring their own vulgar conduct, highlights the retaliatory nature of Plaintiff's termination.  (*Deposition Testimony of Scott Creighton, pg. 47–49; Charles Creighton, pg. 40–42*).  Moreover, Plaintiff's termination was inconsistent with his strong performance history, further supporting a finding of pretext.

PRETEXTUAL JUSTIFICATIONS FOR TERMINATION: DEFENDANTS' JUSTIFICATION FOR TERMINATING PLAINTIFF IS UNDERMINED BY SUBSTANTIAL EVIDENCE OF PRETEXT:

Workplace Culture: The email language cited as justification for Plaintiff's termination does not align with Defendants' own workplace culture, where Scott and Charles Creighton regularly used profanity and aggressive language in emails and conversations.  Their reliance on Plaintiff's email as a reason for termination is both hypocritical and inconsistent with established norms at the company.  (*Deposition Testimony of Scott Creighton, pg. 50–52; Charles Creighton, pg. 40–43*).

Strong Performance History: The Plaintiff's termination was inconsistent with his documented record of success.  Prior to his termination, the Plaintiff had demonstrated exceptional leadership and operational skills, which were critical to the success of his division.  The defendant's abrupt decision to terminate the Plaintiff immediately after his protected activity highlights their retaliatory motive.

Timing of Termination: The Plaintiff's termination occurred within weeks of his objections to the Defendants' privacy violations and requests for accommodations. Courts frequently view such temporal proximity as evidence of retaliation. See *Battaglia*, 214 N.J. at 547.

IMPACT OF RETALIATORY TERMINATION.   THE DEFENDANTS' RETALIATORY TERMINATION OF THE PLAINTIFF HAD SEVERE CONSEQUENCES:

Economic Harm: The Plaintiff's wrongful termination caused substantial financial losses. Expert witness Chris Whalen, CPA, calculated these damages, including lost wages, benefits, and retirement contributions, at $13,959,612 (*Expert Report of Chris Whalen, CPA,* **Exhibit L**).

Emotional Distress: Dr. Rachel Powers, Psy.D., documented the psychological toll of Defendants' actions on Plaintiff, including diagnoses of Major Depressive Disorder and Generalized Anxiety Disorder.  The retaliatory nature of Plaintiff's termination exacerbated these conditions, compounding the harm caused by Defendants' prior actions (*Expert Report of Dr. Rachel Powers, Psy.D.,* **Exhibit K**).

The Plaintiff has satisfied all elements of a retaliation claim under NJLAD.  The evidence demonstrates that Plaintiff engaged in protected activity, suffered an adverse employment action, and was terminated under pretextual circumstances designed to retaliate against him.   The defendants' justifications are unsupported by the record, and their timing and inconsistent behavior underscore their retaliatory motives.  Summary judgment on this claim is warranted to provide full redress for the harm inflicted on Plaintiff.

HARM RESULTING FROM DISCRIMINATION AND RETALIATION:

Defendants' discriminatory and retaliatory actions caused Plaintiff profound harm, including significant financial losses, severe psychological distress, and long-term reputational damage. The evidence establishes a direct link between Defendants' actions and the harm Plaintiff suffered, warranting full redress under NJLAD.

Economic Harm: The Plaintiff's termination resulted in substantial financial losses, including lost wages, benefits, and retirement contributions. Expert witness Chris Whalen, CPA, quantified the Plaintiff's economic damages at $13,959,612 (*Expert Report of Chris Whalen, CPA,* **Exhibit L**). These damages include:

o Lost Wages: Plaintiff's annual salary as General Manager was $275,000. The defendant's termination of Plaintiff prematurely ended his employment, depriving him of significant income.

o Lost Benefits: Plaintiff lost access to employer-provided health insurance, retirement contributions, and other benefits critical to his financial stability.

o Future Earnings: Defendants' retaliatory termination and the reputational damage caused by their actions have diminished Plaintiff's ability to secure comparable employment, further compounding his financial losses.

Chris Whalen's detailed calculations demonstrate the magnitude of the financial harm caused by the Defendants' unlawful conduct, emphasizing the necessity of redress.

Psychological Harm: Plaintiff experienced severe psychological distress as a direct result of Defendants' actions. Dr. Rachel Powers, Psy.D., a licensed psychologist, diagnosed the Plaintiff with Major Depressive Disorder and Generalized Anxiety Disorder. These conditions stemmed from the humiliation, betrayal, and stress caused by:

o  <u>Defendants' Unauthorized Disclosures</u>: The repeated and public violations of Plaintiff's privacy contributed to feelings of helplessness, embarrassment, and anxiety.

o  <u>Failure to Accommodate</u>: Defendants' refusal to grant Plaintiff reasonable accommodations for his cancer treatment and lymphedema therapy exacerbated his emotional distress, forcing him to work under physically and emotionally taxing conditions.

o  <u>Retaliatory Termination</u>: Plaintiff's abrupt termination, particularly in light of his ongoing medical treatment, deepened his psychological injuries.

Dr. Powers' expert report outlines the persistent symptoms Plaintiff continues to experience, including intrusive thoughts, difficulty concentrating, sleep disturbances, and feelings of worthlessness.  (*Expert Report of Dr. Rachel Powers, Psy.D.,* **Exhibit K**).

<u>Reputational Harm</u>: The unauthorized disclosure of Plaintiff's private medical information and his termination caused irreparable damage to his professional reputation.  Being identified as someone undergoing treatment for throat cancer subjected Plaintiff to unwarranted scrutiny, speculation, and pity within his professional circles.  This damage was exacerbated by the Defendants' dissemination of Plaintiff's medical information to external vendors, tarnishing his standing as a leader and professional.

Defendants' retaliatory actions further undermined Plaintiff's reputation by portraying him as unfit or difficult, despite his proven track record of success.  This reputational harm directly impacts Plaintiff's future earning potential and professional relationships.  Courts recognize reputational harm as a legitimate basis for damages in employment discrimination cases.  See *Rooney v. City of Newark*, 2017 N.J. Super.  Unpub. LEXIS 1675, at *22 (App. Div. July 11, 2017).*

<u>Compounded Harm from Systemic Violations</u>: Defendants' systemic disregard for Plaintiff's rights amplified the harm he suffered. Their failure to accommodate his medical needs, unauthorized disclosures, and retaliatory termination created a hostile work environment that significantly impacted Plaintiff's physical and emotional well-being. Scott Creighton and Charles Creighton's deposition testimonies confirm the deliberate and pervasive nature of these violations. For example, Charles Creighton's admission that "this is the way we do things around here" underscores a culture of indifference to employee privacy and rights. (*Deposition Testimony of Charles Creighton, pg. 37–38*).

The harm caused by Defendants' discriminatory and retaliatory actions is extensive and well-documented. The Plaintiff's financial losses, psychological injuries, and reputational damage stem directly from the Defendants' unlawful conduct. The expert reports of Chris Whalen, CPA, and Dr. Rachel Powers, Psy.D., provide compelling evidence of the magnitude and enduring impact of these harms. Summary judgment in Plaintiff's favor is warranted to ensure full and appropriate redress for the profound harm inflicted on him.

III.    **AIDING AND ABETTING**

To state a claim for aiding and abetting liability under New Jersey law, a plaintiff must establish:

1. <u>Underlying Violation</u>: The principal committed an unlawful act or violated a legal duty;
2. <u>Knowledge</u>: The defendant had actual knowledge of the principal's unlawful act;
3. <u>Substantial Assistance</u>: The defendant knowingly and substantially assisted the principal in the commission of the unlawful act; and
4. <u>Intent</u>: The defendant acted with the requisite intent to facilitate or support the principal's unlawful conduct.

See *Tarr v. Ciasulli*, 181 N.J. 70, 84 (2004); *Failla v. City of Passaic*, 146 F.3d 149, 158 (3d Cir. 1998); Gross *v. City of Jersey City*, 2019 U.S. Dist. LEXIS 81559, *16.

<u>DETAILED ANALYSIS OF THE PLAINTIFF'S CASE</u>

<u>Principal Violation</u>: Plaintiff has unequivocally demonstrated that Defendants violated New Jersey's common law privacy protections and the NJLAD.  These violations include unauthorized disclosure of Plaintiff's private medical information, failure to accommodate his disability, and retaliatory termination.  Furthermore, the corporate defendant, Colony Tire, is a health plan provider as defined under HIPAA, which imposes strict confidentiality requirements. By constantly invading Plaintiff's privacy and committing HIPAA violations, Defendants engaged in systemic misconduct that serves as the basis for aiding and abetting liability.  See *Doe v. Trenton Bd. of Educ.*, No. 05-1281, 2009 U.S. Dist. LEXIS 23662, at *24-25 (D.N.J. March 23, 2009) (holding that privacy violations can form the basis of liability under New Jersey law).

<u>Knowing and Substantial Assistance</u>: Scott Creighton played a pivotal role in perpetuating the violations.  During his deposition, he admitted to receiving Plaintiff's explicit email requesting that Charles Creighton not disclose Plaintiff's private medical information.  Despite this clear directive, Scott Creighton allowed Charles Creighton to violate Plaintiff's request and failed to intervene.  Worse, Scott Creighton doubled down by sending his own emails disclosing additional private medical details to internal employees and external vendors.  This active participation constitutes substantial assistance in violating Plaintiff's rights.  Scott Creighton's lack of remorse and testimony that he would act similarly again further underscore his complicity.  See *Gross v. City of Jersey City*, 2019 U.S. Dist. LEXIS 81559, *16.

Charles Creighton similarly facilitated the violations.  His deposition revealed a dismissive attitude toward Plaintiff's explicit objections, justifying the disclosures by stating, "This is the way we do things around here." By initiating the unauthorized disclosures and fostering a culture of disregard for employee privacy, Charles Creighton substantially assisted in the violations.  His

actions were not isolated incidents but part of a systemic pattern of ignoring legal and ethical obligations. See *Hawkins v. Harris*, 141 N.J. 207, 218-19 (1995) (holding that aiding and abetting liability can arise from active participation or endorsement of unlawful behavior).

Intent: Scott and Charles Creighton's actions were deliberate and intentional. Despite knowing Plaintiff's objections, both individuals repeatedly disclosed his private medical information. Scott Creighton's decision to disregard Plaintiff's explicit requests and Charles Creighton's justification of the violations demonstrate a conscious and willful disregard for Plaintiff's rights. Their intent is further evidenced by their deposition testimony, which reveals an entrenched belief that company culture justified their actions, even in the face of legal and ethical standards. See *Tarr v. Ciasulli*, 181 N.J. at 84 (requiring intent and knowledge for aiding and abetting liability).

AMPLIFIED HARM THROUGH AIDING AND ABETTING

The conduct of Scott and Charles Creighton exacerbated the harm suffered by Plaintiff. Dr. Rachel Powers, Psy.D., has diagnosed the Plaintiff with Major Depressive Disorder and Generalized Anxiety Disorder, attributing these conditions to the repeated and public violations of his privacy. The aiding and abetting by both defendants magnified the psychological distress and reputational damage caused by the initial violations. The pervasive nature of their actions ensured that Plaintiff's private medical information reached a broad audience, including external vendors, compounding his emotional suffering and professional harm. See *Restatement (Second) of Torts* § 876(b) (imposing liability for aiding and abetting when conduct substantially contributes to harm).

Plaintiff has set forth a prima facie case for aiding and abetting. Scott Creighton admitted in his deposition that he received Plaintiff's email explicitly requesting that Defendants (Colony Tire, Scott Creighton, and Charles Creighton) not disclose Plaintiff's private health information.

He witnessed Charles Creighton violate Plaintiff's request and did nothing to stop it. Instead, Scott Creighton actively participated by sending out his own emails, violating Plaintiff's demands. Similarly, Charles Creighton justified his repeated violations by stating, "This is the way we do things around here," showing no remorse and admitting he would act similarly in the future.

There is no viable defense that could persuade a reasonable jury to find in favor of Defendants. Their actions, as admitted in depositions and corroborated by documented communications, demonstrate clear knowledge, substantial assistance, and intentional disregard for Plaintiff's rights. Summary judgment is warranted in Plaintiff's favor, as judicial intervention is necessary to provide full redress for the significant harm inflicted on Plaintiff.

<u>Economic and Psychological Harm</u>: The damages incurred by the Plaintiff as a direct result of the Defendants' actions are substantial, well-documented, and deserving of judicial recognition. The Plaintiff's economic losses and psychological injuries highlight the profound impact of the Defendants' unlawful conduct and underscore the necessity for full redress.

<u>Economic Harm</u>: Financial expert Chris Whalen, CPA, has meticulously calculated the Plaintiff's economic damages at $13,959,612. This figure reflects the significant and lasting impact of Defendants' discriminatory and retaliatory actions on Plaintiff's financial stability. These damages include:

- <u>Lost Wages</u>: The Plaintiff's wrongful termination deprived him of an annual salary of $475,000, bonuses, and other income directly tied to his role as General Manager. This substantial salary reflected the Plaintiff's exceptional professional expertise and critical contributions to the company's success. The termination abruptly ended the Plaintiff's ability to earn income commensurate with his skills and experience, further compounding the harm.
- <u>Lost Benefits</u>: The Plaintiff's termination resulted in the loss of valuable employer-sponsored benefits, including health insurance, retirement contributions, and other compensation he relied upon to maintain financial stability. These benefits were essential for the Plaintiff's medical care during his cancer treatment and recovery, leaving him in an especially vulnerable position after his termination.

- Future Earnings: Defendants' wrongful termination irreparably damaged Plaintiff's professional reputation, creating a stigma that will impede his ability to secure comparable employment.  Expert testimony supports that the public disclosure of Plaintiff's private medical information and his abrupt termination cast unwarranted doubt on his reliability and competence, significantly reducing his future earning potential.  The financial losses are not speculative but are grounded in detailed analyses of Plaintiff's employment history, salary trajectory, and industry conditions.  (*Expert Report of Chris Whalen, CPA,* **Exhibit L**).

These economic losses underscore the long-term impact of Defendants' unlawful conduct, which deprived Plaintiff not only of immediate income but also of his ability to sustain financial stability and growth in his career.

Psychological Harm: Plaintiff has suffered severe psychological harm directly resulting from Defendants' discriminatory and retaliatory actions.  Dr. Rachel Powers, Psy.D., diagnosed the Plaintiff with Major Depressive Disorder and Generalized Anxiety Disorder.  These conditions arose from the stress, humiliation, and betrayal caused by Defendants' actions and are characterized by the following factors:

1. Breach of Trust: Defendants' unauthorized disclosure of Plaintiff's private medical information, including dissemination to external vendors and colleagues, violated Plaintiff's fundamental right to privacy.  This breach of trust eroded Plaintiff's sense of dignity and autonomy, causing lasting emotional distress.
2. Workplace Hostility: Defendants' refusal to accommodate Plaintiff's reasonable medical needs and their dismissive attitude toward his rights under NJLAD created a hostile and unsupportive work environment.  The Plaintiff was forced to continue working under physically and emotionally taxing conditions without necessary accommodations, exacerbating his psychological injuries.
3. Retaliatory Termination: The Plaintiff's termination was abrupt and unjustified, leaving him feeling devalued and unfairly targeted for asserting his rights.  This retaliatory action deepened the Plaintiff's psychological distress and contributed to feelings of worthlessness and helplessness.

Dr. Powers' evaluation provides a comprehensive and detailed account of Plaintiff's psychological symptoms, which include persistent feelings of sadness, loss of self-esteem, difficulty concentrating, sleep disturbances, and a pervasive sense of humiliation and betrayal.  These conditions were directly caused by Defendants' discriminatory and retaliatory actions and have significantly impaired Plaintiff's quality of life.  Dr. Powers concluded that Plaintiff's Major

Depressive Disorder and Generalized Anxiety Disorder require ongoing psychological treatment and therapeutic interventions to mitigate the long-term impact of the harm he endured (*Expert Report of Dr. Rachel Powers, Psy.D.,* **Exhibit K**).

The psychological harm suffered by Plaintiff was further exacerbated by the conduct of Scott and Charles Creighton, whose behavior demonstrated a callous disregard for Plaintiff's dignity and well-being:

<u>Scott Creighton</u>: During his deposition, Scott Creighton admitted that he felt no remorse for his actions, which included the unauthorized disclosure of Plaintiff's private medical information and the subsequent retaliatory termination. Scott Creighton went further to state that he would repeat these actions if presented with the same circumstances. This admission underscores Defendants' lack of accountability and highlights the intentional nature of their conduct. The absence of remorse compounded the trauma Plaintiff experienced, intensifying feelings of helplessness and betrayal. (*Deposition Testimony of Scott Creighton, pg. 45–46*).

<u>Charles Creighton</u>: Charles Creighton's deposition revealed a systemic disregard for employee privacy and rights. When questioned about his decision to disclose Plaintiff's sensitive medical information, Charles Creighton justified his actions by stating, "This is the way we do things around here." This statement reflects an entrenched culture of indifference to privacy protections and underscores the deliberate nature of Defendants' violations. By normalizing these practices, Charles Creighton not only amplified Plaintiff's psychological toll but also demonstrated the institutionalized nature of Defendants' unlawful conduct. (*Deposition Testimony of Charles Creighton, pg. 37–38*).

The admissions by Scott and Charles Creighton reveal not only their personal roles in exacerbating Plaintiff's emotional distress but also the broader culture of disregard for employee

rights within the organization. These factors have contributed to Plaintiff's ongoing psychological injuries, necessitating continued treatment and further highlighting the profound impact of Defendants' unlawful conduct.

The economic and psychological harm sustained by Plaintiff is a direct and foreseeable consequence of Defendants' egregious violations of NJLAD and common law privacy protections. The evidence, including expert testimony, deposition admissions, and detailed financial analyses, is uncontroverted and overwhelmingly supports a finding that Plaintiff is entitled to significant compensatory damages.

These damages not only provide redress for Plaintiff's suffering but also serve to hold Defendants accountable for their unlawful conduct. Financial expert Chris Whalen quantified Plaintiff's economic losses at $13,959,612, encompassing lost wages, benefits, and retirement contributions. Additionally, Dr. Rachel Powers provided compelling evidence of the severe psychological harm inflicted upon Plaintiff, linking it directly to Defendants' actions. These findings highlight the profound and enduring impact of Defendants' conduct, necessitating full redress under New Jersey law.

**CONCLUSION**

The evidence presented in this case overwhelmingly supports Plaintiff's claims and demonstrates Defendants' repeated and egregious violations of Plaintiff's rights under New Jersey law. Plaintiff has established, through deposition testimony, expert reports, and documented communications, that:

1. Defendants engaged in unauthorized disclosures of Plaintiff's private medical information, violating common law privacy protections and HIPAA obligations;

2. Defendants failed to accommodate Plaintiff's medical needs as required by NJLAD;

3. Defendants retaliated against Plaintiff for asserting his rights, culminating in his wrongful termination; and

4. Defendants Scott and Charles Creighton knowingly and intentionally aided and abetted these unlawful actions, further exacerbating the harm suffered by Plaintiff.

The damages Plaintiff suffered—financial, psychological, and reputational—are significant and directly attributable to Defendants' conduct. Expert analyses by Chris Whalen, CPA, and Dr. Rachel Powers, Psy.D., quantify and document the profound impact of Defendants' actions, underscoring the need for full redress.

Defendants have failed to present any viable defense to justify their actions or create a genuine dispute of material fact. Their deposition admissions, dismissive attitudes, and systemic disregard for employee rights eliminate any reasonable basis for their conduct. Summary judgment is warranted in Plaintiff's favor to provide justice for the harm inflicted and to hold Defendants accountable for their systemic violations.

Plaintiff respectfully requests that this Court grant summary judgment in his favor and provide full and appropriate relief to address the extensive harm he has endured. The evidence leaves no genuine issue of material fact. Defendants' actions and failure to present a viable defense justify a judgment as a matter of law in favor of Plaintiff.

Respectfully submitted,

December 20, 2024

*/s/Tyrone A. Blackburn, Esq.*
Tyrone A. Blackburn, Esq.
T. A. Blackburn Law, PLLC
90 Broad Street, 2nd Floor
New York, NY 10004

34