<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| ERIK KERTESZ,<br><br>   *Plaintiff,*<br><br>     v.<br><br>COLONY TIRE CORPORATION, *et al.,*<br><br>   *Defendants.* | Civil Action No. 20-12364<br><br>**OPINION**<br><br>September 30, 2025 |

**SEMPER**, District Judge.

   **THIS MATTER** comes before the Court on (1) Defendants Colony Tire Corporation ("Colony Tire"), Charles "Charlie" Creighton,[1] and Scott Creighton's ("Defendants") motion for summary judgment (ECF 95, "Defendants' Motion" or "Defs. Mot.") and (2) Plaintiff Erik Kertesz's ("Kertesz" or "Plaintiff") motion for summary judgment. (ECF 96, "Plaintiff's Motion" or "Pl. Mot.") The parties filed briefs in opposition to each respective motion. (ECF 99, "Defs. Opp."; ECF 100, "Pl. Opp.") The parties also filed reply briefs. (ECF 103, "Defs. Reply"; ECF 109, "Pl. Reply".) The Court reviewed the parties' submissions and decided the motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons stated below, Plaintiff's motion for summary judgment is **DENIED** and Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

---

[1] On July 16, 2025, Plaintiff moved to substitute Susan Creighton for Defendant Charles Creighton following Charles Creighton's death on May 15, 2025. (ECF 112, "Motion to Substitute".) On August 15, 2025, Magistrate Judge James B. Clark granted Plaintiff's Motion to Substitute. (ECF 115.)

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY[2]

The present lawsuit arises from Plaintiff's former employment with Colony Tire. Defendant is a privately-owned company that provides tire care, auto repair, and maintenance services, as well as wholesale tire distribution via its subsidiary Atlantic Tire Distributors ("Atlantic Tire"). (DSMF ¶ 1.) At the time the parties filed motions for summary judgment, Defendant Charlie Creighton[3] was CEO of Colony Tire, and Scott Creighton, his son, was President. (*Id.*) Plaintiff began his employment at Colony Tire in August 2017 as the General Manager of Atlantic Tire. (*Id.* ¶ 9; PSMF ¶ 7.) During Plaintiff's employment as General Manager of Atlantic Tire, Plaintiff was responsible for Atlantic Tire's wholesale tire distribution operations, including its management, sales staff, and the operations of warehouses. (DSMF ¶ 10; PSMF ¶ 8.) Plaintiff's responsibilities included visiting Colony Tire's six warehouses. (DSMF ¶ 11; PSMF ¶ 9.)

Plaintiff signed an employment agreement on January 1, 2018, which formalized his role as General Manager of Atlantic Tire. (DSMF ¶ 12.) The Employment Agreement implies, but does not explicitly state, that Plaintiff was expected to move to North Carolina from New Jersey for his role at Colony Tire. (*See* ECF 95-3, Certification of Joseph DeBlasio, "DeBlasio Cert."; ECF 95-5, DeBlasio Cert. Ex. G.)[4] On January 30, 2019, Plaintiff suffered a heart attack. (DSMF ¶ 16;

---

[2] The facts and procedural history are drawn from Defendants' brief in support of their motion for summary judgment (ECF 95-10, "Defs. Br."), Plaintiff's brief in support of his motion for summary judgment (ECF 96-2, "Pl. Br."), Defendants' brief in opposition (ECF 99), Plaintiff's brief in opposition (ECF 100), Defendants' brief in reply (ECF 103), Plaintiff's brief in reply (ECF 109) and the parties' submissions of undisputed material facts (ECF 95-9, "DSMF"; ECF 97-17, "PSMF") and responses to the submissions of undisputed material facts (ECF 99-1 (Defendants' Response to PSMF); ECF 102 (Plaintiff's Response to DSMF)). The Court has also considered Defendants' responding statement of undisputed material facts (ECF 103-1) and Plaintiff's supplemental statement of undisputed material facts responding to Defendants' objections (ECF 105). The Court does not credit statements in these filings that contain legal argument or are unsupported by the record. *See* L. Civ. R. 56.1.
[3] Defendant Charles Creighton died on May 15, 2025. (*See* ECF 112.)
[4] The Employment Agreement states: "Provided your house is listed for sale at the proper market price, Colony Tire/ Atlantic Tire will work with you in a very generous manner regarding your apartment/ rental house in Edenton [North Carolina]." (ECF 95-5, DeBlasio Cert. Ex. G.)

PSMF ¶ 10.) On that same day, Scott Creighton sent a text message to Plaintiff informing Plaintiff that he would send an email "about you so everyone can pray for you but I'll wait to hear from you about who do you want people to call/email?" (DSMF ¶ 16; ECF 95-5, DeBlasio Cert. Ex. I.) Plaintiff responded: "Thanks it is ok if people call." (*Id.*) On February 28, 2019, Scott Creighton texted Plaintiff again, stating, "[a] lot of people asked last week how you were doing. Would you like me or you to send out an update to all users on how you're doing?" (DSMF ¶ 17 (citing DeBlasio Cert. Ex. J).) Plaintiff responded, "Okay, you can send something." (*Id.*) Colony Tire paid Plaintiff his full salary while he recovered from his heart attack. (DSMF ¶¶ 18-19.) Plaintiff maintains that he worked as usual while recovering from his heart attack. (PSMF ¶ 11.)

In July 2019, less than a year after his heart attack, Plaintiff was diagnosed with throat cancer. (DSMF ¶ 20; PSMF ¶ 12.) Plaintiff informed Charlie and Scott Creighton of the diagnosis. (DSMF ¶ 20; PSMF ¶ 12.) On July 9, 2019, Plaintiff emailed Scott and Charlie Creighton, "Just leaving the hospital. Procedure went ok. The location of the mass makes inoperable [sic]. I have an appointment on Thursday to discuss plan 'B'." (PSMF ¶¶ 13-14; ECF 97, Declaration of Tyrone Blackburn[5] ("Blackburn Decl."); ECF 97-8, Blackburn Decl. Ex. H.) On the same day, Charlie Creighton responded: "So very sorry. Do you plan to update your Associates? Already done it? Want us to do it?" (*Id.*) Plaintiff replied, "[I] will update my associates when I have plan 'B'." (*Id.*) Plaintiff testified that his doctors recommended proton treatment for his cancer diagnosis; the treatment was scheduled to begin on August 19, 2019. (DSMF ¶ 22; ECF 95-4, DeBlasio Cert. Ex. C, Kertesz Dep. Tr., at 187:16-188:5, 202:14-24.)

On August 19, 2019, Plaintiff reached out to Colony Tire's Human Resources Manager, Adora Ambrose, to ask about FMLA leave. (DSMF ¶ 24; ECF 95-6, DeBlasio Cert. Ex. N.)

---

[5] The Court disregards improper legal and factual arguments contained in the Declaration of Tyrone Blackburn.

Kertesz stated, in part, "Just spoke with Scott he said that I need to go out on FMLA[6] because it's required by law and the insurance. How does this all work as far as pay?" (ECF 95-6, DeBlasio Cert. Ex. N at D-00076.) Ambrose replied to Plaintiff on the same day and included details about payment and health benefits during FMLA leave. (*Id.* at D-00075.) After some exchanges back and forth, on August 26, 2019, Plaintiff wrote to Ambrose again, stating in part, "I gave the FMLA papers to my doctor for certification. I hope to have them back soon so that I can get them back to you ASAP." (*Id.* at D-00074.)

On August 28, 2019, Colony Tire received the "Certification of Health Care Provider for Employee's Serious Health Condition" in support of Plaintiff's need for FMLA leave. (DSMF ¶ 26; ECF 95-6, DeBlasio Cert. Ex. Q, "FMLA Certification".) Plaintiff's request for FMLA leave was granted on September 4, 2019. (DSMF ¶ 26; ECF 95-7, DeBlasio Cert. Ex. R.) Although Colony Tire provided Plaintiff with an application for short-term disability benefits, Plaintiff did not return the application. (DSMF ¶ 25.) After Plaintiff was diagnosed with cancer, individual Defendants Charlie Creighton and Scott Creighton sent the following emails that contained information about Plaintiff:

- On July 23, 2019, Scott Creighton replied to a work-related email with ten recipients, including Plaintiff, advising that "Erik is meeting with doctors to treat his newfound cancer" (DSMF ¶ 21; ECF 95-6, DeBlasio Cert. Ex. L ("July 23, 2019 Email"); PSMF ¶ 15; ECF 97-16, Blackburn Cert. Ex. P.)

- On August 16, 2019, Charlie Creighton sent an email to "all users" within Colony Tire, stating, "Erik Kertesz has been diagnosed with a cancer tumor behind his throat. He will begin treatment Aug. 19 at U Penn Hospital. Please [keep] him and his family in your prayers. God Bless them." (DSMF ¶ 23; ECF 95-6, DeBlasio Cert. Ex. M ("August 16, 2019 Email"); PSMF ¶ 16; ECF 97-2, Blackburn Cert. Ex. B.)

- On September 11, 2019, Scott Creighton emailed one vendor and Plaintiff, stating, "Erik is out until sometime in October being treated for a cancerous tumor in [h]is throat. That week is not good for me. let [sic] me look at calendar and get back to you. thanks [sic]."

---

[6] "FMLA" refers to the Family Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.*

(DSMF ¶ 27; ECF 95-7, DeBlasio Cert. Ex. S ("September 11, 2019 Email"); PSMF ¶ 17; ECF 97-3, Blackburn Cert. Ex. C.)

- On October 7, 2019, one outside sales representative emailed Plaintiff and Scott Creighton asking for a time to meet. (DSMF ¶ 29; ECF 95-7, DeBlasio Cert. Ex. U ("October 7, 2019 Email"); PSMF ¶ 19; ECF 97-4, Blackburn Cert. Ex. D.) Scott Creighton replied to the sales representative and Plaintiff, stating that Plaintiff was "still out finishing up chemo and radiation for cancer." (*Id.*)

- On October 18, 2019, Scott Creighton sent an email to Atlantic@colonytire.com,[7] providing notice that the Colony Tire planned to postpone an Atlantic Tire Incentive trip for customers (the "Incentive Trip"). (DSMF ¶ 30; ECF 95-7, DeBlasio Cert. Ex. V ("October 18, 2019 Email"); PSMF ¶¶ 20-21; ECF 97-5, Blackburn Cert. Ex. E.) In explaining the reasons for the cancelation of the Atlantic Tire Incentive Trip, Scott Creighton wrote, in part, that he did a "terrible job" taking Plaintiff's place while Plaintiff was out with his "illnesses this year." (*Id.*) Scott Creighton further stated, "Please try to explain what our circumstances have been this year if and when you need to tell your customer about the postponement. Thanks." (*Id.*)

On November 7, 2019, Plaintiff submitted a doctor's note clearing him to return to work on November 11, 2019, and Plaintiff returned to work on that date. (DSMF ¶ 31; ECF 95-7, DeBlasio Cert. Exs. W, X.) On November 14, 2019, Plaintiff emailed Scott Creighton, copying Charlie Creighton and Andrew Bergeron regarding the Atlantic Tire Incentive Trip. (PSMF ¶ 22.) Plaintiff wrote, in part:

> I also want to mention the fact I am very upset with the uncomfortable situation that you have created for me regarding this trip. Not only is it unprofessional and poor customer service to cancel an incentive trip on such short notice but, the fact that you told everyone involved that it was "due to my illnesses" and to "please explain the circumstances" is completely unacceptable. Obviously, the customers, salespeople, and vendors were going to be unhappy with the decision and clearly, they were since the trip was reinstated. My health is my private business and I'm not ok with you using me as an excuse just because someone else did not take over the task while I was out on FMLA. (ECF 97-10, Blackburn Cert. Ex. J.)

---

[7] Plaintiff's Statement of Undisputed Material Fact (PSMF) states that the October 18, 2019 email was sent to "over 200 employees." (PSMF ¶ 21.) The email dated October 18, 2019 does not identify the number of recipients. Scott Creighton testified that the "Atlantic@colonytire.com" email address includes only 15 to 20 management level and sales employees of Atlantic Tire, including Plaintiff. (*See* ECF 97-9, Blackburn Decl. Ex. I, S. Creighton Dep. Tr., at 74:22-75:6.) Plaintiff has not disputed this testimony, nor has Plaintiff cited any evidence in support of his contention that this email address includes over 200 employees. The Court therefore treats Scott Creighton's testimony as uncontested.

On November 20, 2019, Plaintiff missed one day of work for a medical appointment in New Jersey. (DSMF ¶ 33.) On the same day, Plaintiff emailed Charlie Creighton, Scott Creighton, and Andrew Bergeron with the subject line, "Update." (ECF 95-7, DeBlasio Cert. Ex. Z.) In that email, Plaintiff stated: "I have developed lymphedema [sic]. It does [not] impact my ability to work but requires that I receive weekly treatment. I will arrange to have this done in NC." (*Id.* at D-00138.) Plaintiff forwarded the email to Adora Ambrose, clarifying that the appointments would not impact "working." (*Id.*) In response, Ambrose replied, "I am happy to hear that your condition will not affect your ability to work. Upon your return to work, please come meet with me so that we may discuss any potential accommodation that you may need." (*Id.*)

Plaintiff replied to Ambrose the same day, informing her that "[a]s of right now the only accommodation that I will potentially need is flexibility in my work schedule so that I can attend weekly appointments." (*Id.* at D-00137.) Plaintiff also stated, "Currently, I have not decided on which specialist I will be seeing nor have I scheduled any appointments so, I do not know what appointment times are available or what flexibility might be needed." (*Id.*) Less than 24 hours later, Plaintiff wrote to Adora again, stating, "Just wanted to make sure that you received this . [sic] Will this be an issue?" (*Id.*) The same day, on November 21, 2019, Ambrose replied that she "cannot determine if there will be an issue based on the information you have provided." (*Id.*) Her email continued, "[a]s I stated before, please come see me upon your return to Edenton [North Carolina], and we can discuss your accommodation needs further. If you need information before your arrival, please feel free to call me directly." (*Id.*)

The next day, on November 22, 2019, Plaintiff wrote to Ambrose in the same email chain, asking if she would be "docking" his pay for the time he was at his follow-up appointment given that he "used up" his paid vacation and sick days when he was "forced to go out on FMLA." (*Id.*)

6

Ambrose replied: "Yes[.]" (*Id.* at D-00136.) Plaintiff replied, asking how many hours were being withheld, and asking Ambrose to "please explain why this is the first-time that senior management has decided to handle it this way" since he was "out numerous times this past year for doctor appointments and [his] pay was not withheld." (*Id.*) Plaintiff also noted that he "continue[s] to work remotely answering calls, emails, etc." (*Id.*) Ambrose replied by asking Plaintiff, "How many hours have you missed this pay period? As I previously stated, please come see me upon your return and we can discuss and clarify further." (*Id.*) Also on November 22, 2019, Plaintiff reiterated his concern that his pay was previously not withheld, and further stated, "[b]ased on your previous email responses and the current situation all communication regarding my concerns will be done in writing. I have no intention of discussing anything related to this situation unless I have counsel present, or the conversation is recorded." (*Id.*)

On November 24, 2019, Plaintiff sent Ambrose and Charlie Creighton an email regarding the exhaustion of his vacation and sick pay. (DSMF ¶ 35.) In the email, Plaintiff stated: "I'll be extremely clear since you are supposedly confused by my question. I specifically asked you why my pay was docked this week, when it has never been docked this year, despite the circumstances being the same." (ECF 95-8, DeBlasio Cert. Ex. AA.)  He continued, in relevant part,

> Claiming that you are "completely unaware of that time you have taken off thus far" is absurd and a blatant lie. Since January of 2019 to date, there have been numerous, consecutive periods of times when I have been away from the office, working under the same circumstances . . . I did not "elect to leave without pay" this week, as you claim. Rather, as I have in the past, I reported my time away and continued to carry out my job responsibilities during my time out of the office. (*Id.*)

The next day, on November 25, 2019, a little over two weeks after Plaintiff returned from FMLA leave, Charlie Creighton sent Plaintiff a notice that Colony Tire had terminated Plaintiff's employment (the "Termination Letter"). (DSMF ¶ 36; PSMF ¶¶ 35-36.) The Termination Letter stated, in part, "I was very disappointed to read your most recent email to Adora in which you

talked down to her and called her a liar when she was merely trying to do her job." (ECF 95-8, DeBlasio Cert. Ex. BB.) It continued, "it has been two weeks since you returned to work and you have not even met with or discussed face-to-face anything with any member of our senior management." (*Id.*)

Plaintiff filed his Complaint in New Jersey state court on August 5, 2020. (ECF 1, "Compl.") The Complaint includes claims for common law invasion of privacy against Colony Tire (Count One), Charlie Creighton (Count Two), and Scott Creighton (Count Three, together with Counts One and Two, the "Invasion of Privacy Claims"); Failure to Accommodate in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann 10:5-1, *et seq.*, against all Defendants (Count Four); and Aiding and Abetting in violation of the New Jersey Law Against Discrimination, 10:5-12(e), against Charlie Creighton and Scott Creighton (together, the "Creightons") (Count Five). (ECF 1; ECF 95-4, DeBlasio Cert. Ex. A.) On September 4, 2020, Defendants removed this action to federal court. (*Id.*) On September 11, 2020, Defendants moved to transfer the case to the U.S. District Court for the Eastern District of North Carolina. (ECF 2.) On June 14, 2021, Magistrate Judge James B. Clark issued a Report and Recommendation denying Defendants' motion to transfer (ECF 15), which the Court adopted on January 3, 2022. (ECF 22.) Throughout the course of this litigation, Plaintiff moved to amend the Complaint three separate times.[8] (ECF 41; ECF 48; ECF 75.) Plaintiff's first two motions to amend were denied; he withdrew the third. (ECF 47; ECF 62; ECF 81.)

On December 20, 2024, Defendants and Plaintiff filed respective motions for summary judgment (ECF 95, Defendants' Motion; ECF 96, Plaintiff's Motion.) Each moved for summary

---

[8] Notably, in Plaintiff's second motion to amend the Complaint (ECF 48), Plaintiff attempted to add claims for, among others, "ADA Disability Discrimination"; "ADA Disability Retaliation"; FMLA "Involuntary Leave"; and "Retaliation under the New Jersey Law Against Discrimination." (ECF 48-3.)

judgment on all of Plaintiff's claims. (*See id.*) On January 17, 2025, Defendants filed an opposition to Plaintiff's Motion. (ECF 99, Defs. Opp.)[9] On the same day, Plaintiff filed an opposition to Defendants' Motion (ECF 100, Pl. Opp.) and an "Affidavit in Opposition" to the exhibits attached to the DeBlasio Certification in support of Defendants' Motion (ECF 101).[10] The following day, January 18, 2025, Plaintiff filed a Response to Defendants' Statement of Undisputed Material Facts. (ECF 102.) On January 27, 2025, Defendants filed a reply in further support of their Motion. (ECF 103, Defs. Reply) and a responding statement of undisputed material facts (ECF 103-1). Also on January 27, 2025, Plaintiff filed a reply in further support of his Motion (ECF 104) and a supplemental statement of undisputed material facts responding to Defendants' objections (ECF 105). Because Plaintiff's filing at ECF 104 did not conform to Local Civil Rule 7.2, the Court allowed Plaintiff to filing a conforming reply (ECF 108), which Plaintiff filed on February 7, 2025. (ECF 109, Pl. Reply.)[11]

On July 24, 2025, Plaintiff's attorney filed a "Notice of Errata" to correct erroneous citation and quotation errors contained in all four briefs Plaintiff filed in support of his Motion for summary judgment and in opposition to Defendants' Motion for summary judgment. (ECF 114.) In this opinion, the Court will not consider Plaintiff's amended briefs or the errata at ECF 114. Instead,

---

[9] Defendants appear to have erroneously filed two copies of their memorandum in opposition to Plaintiff's Motion; the Certification of Michael A. Tecza in Support of Defendants' Motion for Summary Judgment; and Exhibit A to the Tecza Certification. (*See* ECF 98, ECF 99.) Because ECF 99 also includes Defendants' Response to Plaintiff's Statement of Undisputed Material Facts (ECF 99-1), the Court considers ECF 99 the operative filing for purposes of this opinion.

[10] Plaintiff's "Affidavit in Opposition" (ECF 101) includes argument and appears to function as a supplemental brief; therefore, it is not in compliance with Fed R. Civ. P. 56(c)(4) and L. Civ. R. 56.1. Because Plaintiff also filed a brief in opposition to Defendants' Motion (ECF 100), the Court does not consider Plaintiff's "Affidavit in Opposition" in this opinion.

[11] The Court treats the filing at ECF 109 as Plaintiff's operative Reply in Further Support of its Motion for Summary Judgment.

the Court treats any propositions or arguments supported by incorrect or made-up citations as unsupported.[12]

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted if the movant shows that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Del. River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*

---

[12] The errors were the result of Plaintiff's attorney's use of artificial intelligence ("AI") tools. (*See* ECF 114.) As Magistrate Judge José R. Almonte has recently recognized, "[u]nfortunately, attorneys' use of generative AI without proper oversight has become a prevalent issue for courts across the country . . . those who rely on AI blindly, do so at their own peril." *OTG New York, Inc. v. OTTOGI Am., Inc.*, No. 24-CV-07209, 2025 WL 2671460, at *2 (D.N.J. Sept. 18, 2025) (imposing monetary sanctions for party's use of AI in briefing). Given Plaintiff's attorney's self-disclosure of his use of AI, along with his representation that he has taken continuing legal education courses on the topic, the Court declines to impose sanctions at this time. (*See* ECF 114.) The Court does, however, caution Plaintiff's attorney: providing submissions to the Court with inaccurate and false information violates the New Jersey Rules of Professional Conduct. *See, e.g.*, New Jersey Rules of Professional Conduct 3.1, 4.1(a)(1), 8.4(c), and 3.3. It is sanctionable conduct. *See OTG*, 2025 WL 2671460. In the event Plaintiff's attorney relies on AI without proper oversight again, the Court will not likely be so lenient.

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23). Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48.

## III.    ANALYSIS

### A.  Invasion of Privacy Claims (Counts One, Two, and Three)

The parties both argue that they are entitled to summary judgment on the Invasion of Privacy Claims, which arise under New Jersey law. (*See* Defs. Br. at 5-13; Pl. Br. at 11-17.) Plaintiff's Invasion of Privacy Claims are premised on Charlie and Scott Creighton's July 23, 2019; August 16, 2019; September 11, 2019; October 7, 2019; and October 18, 2019 Emails (together, the "2019 Emails"), which referenced Plaintiff's "cancer" and "illnesses." (*See* Compl.

¶¶ 67-90; Pl. Br. at 7-9, 11-17; ECF 95-6, DeBlasio Cert. Ex. L; ECF 95-6, DeBlasio Cert. Ex. M; ECF 95-7, DeBlasio Cert. Ex. S; ECF 95-7, DeBlasio Cert. Ex. U; ECF 95-7, DeBlasio Cert. Ex. V.) New Jersey Courts recognize a common law action for invasion of privacy. *See Romaine v. Kallinger*, 109 N.J. 282, 297-98 (1988). Under New Jersey law, the tort of invasion of privacy encompasses four scenarios:

> (1) intrusion (e.g., intrusion on plaintiff's physical solitude or seclusion, as by invading his or her home, illegally searching, eavesdropping, or prying into personal affairs); (2) public disclosure of private facts (e.g., making public private information about plaintiff); (3) placing plaintiff in a false light in the public eye (which need not be defamatory, but must be something that would be objectionable to the ordinary reasonable person); and (4) appropriation, for the defendant's benefit, of the plaintiff's name or likeness.

*Rumbauskas v. Cantor*, 649 A.2d 853 (N.J. 1994).

Plaintiff alleges that Defendants committed the tort of invasion of privacy based on the second scenario, public disclosure of private facts. (Pl. Br. at 12-13.) The tort of invasion of privacy by publication of private facts involves the following elements: "[1] the matters revealed were actually private, [2] dissemination of such facts would be offensive to a reasonable person, and [3] there is no legitimate interest of the public in being apprised of the facts publicized." *Romaine*, 109 N.J. at 297 (internal quotation omitted).

Defendants argue that summary judgment in their favor is warranted on the Invasion of Privacy Claims because (1) Plaintiff consented to the disclosures in the 2019 Emails; (2) the "publicity" of the 2019 Emails is insufficient to support an unlawful invasion of privacy; and (3) no reasonable person would find the 2019 Emails offensive. (Defs. Br. at 6-13; Defs. Opp. at 6-16; Defs. Reply at 3-10.) Conversely, Plaintiff argues that he is entitled to summary judgment because (1) Defendants revealed Plaintiff's private medical information publicly; (2) the unauthorized dissemination of this information would be "deeply offensive" to a reasonable

person; (3) there was a lack of legitimate public concern in sharing the information; and (4) Plaintiff did not consent to the disclosures. (Pl. Br. at 11-17; Pl. Reply at 7-8.)

As an initial matter, the Court agrees with Defendants that Plaintiff cannot maintain a cause of action for invasion of privacy based on disclosures in the July 23, 2019, September 11, 2019, October 7, 2019, and October 18, 2019 Emails. But there is a genuine issue of material fact as to whether the August 16, 2019 Email constituted an invasion of privacy without Plaintiff's consent.

**1. The July 23, 2019, September 11, 2019, October 7, 2019, and October 18, 2019 Emails**

Based on the undisputed facts in this case, the July 23, 2019, September 11, 2019, October 7, 2019, and October 18, 2019 Emails do not as a matter of law constitute an invasion of privacy because Plaintiff cannot satisfy the publicity requirement for these emails. Restatement (Second) of Torts defines "publicity" as "[a] matter [that] is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge . . . Thus it is not an invasion of the right to privacy . . . to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons." Restatement (Second) of Torts § 652D, Comment (a). *See also Hamza v. United Cont'l Holdings, LLC*, No. 19-8971, 2021 WL 3206814, at *4 (D.N.J. July 29, 2021) (citing *McNemar v. Disney Store, Inc.*, 91 F.3d 610, 622 (3d Cir. 1996)) ("In New Jersey, publication means that information is 'communicat[ed] to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge . . . .'").

Here, it is undisputed that the July 23, 2019 Email had nine recipients in addition to Plaintiff; the September 11, 2019 Email and October 7, 2019 Email each had one recipient in addition to Plaintiff; and the October 18, 2019 Email had fifteen to twenty recipients. (*See* ECF 95-6, DeBlasio Cert. Ex. L; ECF 95-7, DeBlasio Cert. Ex. S; ECF 95-7, DeBlasio Cert. Ex. U;

13

ECF 95-7, DeBlasio Cert. Ex. V.) Dissemination to a single individual or a small group "is far from communicating to a large enough group such that [Plaintiff's] information became public knowledge." *Foley v. Medicredit, Inc.*, No. 21-19764, 2022 WL 3020129, at *3 (D.N.J. July 29, 2022) (citing *Hamza*, 2021 WL 3206814, at *10). Based on these numbers, the Court finds that the July 23, 2019; September 11, 2019; October 7, 2019; and October 18, 2019 Emails, which were sent to either a single individual or a small group, do not meet the "publicity" requirement for the tort of invasion of privacy and thus cannot sustain Plaintiff's Invasion of Privacy Claims.

### 2. The August 16, 2019 Email

The final email that forms the basis of Plaintiff's Invasion of Privacy Claims is the August 16, 2019 Email from Charlie Creighton, which states, "Erik Kertesz has been diagnosed with a cancer tumor behind his throat. He will begin treatment Aug. 19 at U Penn Hospital. Please [keep] him and his family in your prayers. God bless them." (DSMF ¶ 23; ECF 95-6, DeBlasio Cert. Ex. M; PSMF ¶ 16; ECF 97-2, Blackburn Cert. Ex. B.) There are issues of material fact with respect to this email, and the Court cannot conclude at this stage whether it was an invasion of privacy as a matter of law.

Unlike the other 2019 Emails, the August 16, 2019 Email was sent to two hundred people, all employees of Colony Tire. (Defs. Br. at 10; Defs. Opp. at 9 (citing S. Creighton Dep. Tr. at 122:24-123:3); Pl. Br. at 12.) This number can satisfy the publicity requirement of Plaintiff's invasion of privacy claim. Even though the recipients of the August 16, 2019 Email were Plaintiff's coworkers, given the number of recipients, the Court is not persuaded that Defendants did not give "sufficient publicity" to any of Plaintiff's private health information. (Defs. Opp. at 10; *see also id.* at 15; Defs. Reply at 4-5 (noting that all of the email recipients were internal to Colony Tire with the exception of two individual vendors).)

As to the other elements of the tort, the August 16, 2019 Email also includes private information. Although Plaintiff's contention that "medical information, especially relating to serious conditions like cancer, is among the most sensitive categories of personal information" is uncited (Pl. Br. at 12), Defendants tellingly do not explicitly contest that Plaintiff's cancer diagnosis and treatment information were private. (*See* Defs. Br. at 5-13; Defs. Opp. at 7-16.) The Court finds that the information shared in the August 16, 2019 Email can be considered private. *See* Restatement (Second) of Torts § 652D (1977) (categorizing "many unpleasant or disgraceful or humiliating illnesses" as "normally entirely private matters").

However, "there is no liability for giving further publicity to what the plaintiff himself leaves open to the public eye." *Id.* Here, there are disputed issues of material fact regarding Plaintiff's consent to the disclosures, which precludes this Court from concluding that Plaintiff had a reasonable privacy interest and that the dissemination of information in the August 16, 2019 Email "would [or would not] be offensive to a reasonable person." *Romaine*, 109 N.J. at 297; *see also Christie v. Nat'l Inst. for Newman Stud.*, No. 16-6572, 2019 WL 1916204, at *12 (D.N.J. Apr. 30, 2019) (quoting *Stengart v. Loving Care Agency, Inc.*, 990 A.2d 650, 660 (N.J. 2010)) ("[W]hether an employee has a reasonable expectation of privacy in [his/her] particular work setting must be addressed on a case-by-case basis.").

Defendants argue that Plaintiff consented to the disclosures made in the 2019 Emails, including the August 16, 2019 Email, and Plaintiff "cannot allege that he had a privacy interest since he made no effort to keep the information confidential." (Defs. Br. at 12.) Whether Plaintiff did or did not consent to the disclosure of the information contained in any of the 2019 Emails, including (as relevant here) the August 16, 2019 Email, is an issue of fact that is in dispute. Defendants argue that Plaintiff (1) provided express consent at the time of his heart attack and (2)

provided implied consent when he received the 2019 Emails and did not voice his objections to them until he complained about being blamed for the cancelation of the Incentive Trip. (Defs. Br. at 13; Defs. Reply at 6-8.) Plaintiff disagrees. (*See* Pl. Opp. at 6, 9; Pl. Reply at 11.)

As to express consent, the parties' version of events conflict. In support of their position, Defendants point to the January 30, 2019 and February 28, 2019 text messages between Scott Creighton and Plaintiff, in which Plaintiff expressly gave consent for Scott Creighton to send emails to "all users" with updates regarding Plaintiff's heart attack. (*See* ECF 95-5, DeBlasio Cert. Exs. I, J.) Defendants argue that this consent was ongoing through Plaintiff's cancer treatment and diagnosis. (Defs. Br. at 7; Defs. Opp. at 8; Defs. Reply at 6-8.) In contrast, Plaintiff maintains that those disclosures were limited to the details of his heart attack and did not extend to disclosures regarding his cancer. (Pl. Br. at 14; *see also* ECF 95-4, DeBlasio Cert. Ex. C, Kertesz Dep. Tr., at 373:22-380:15 (testimony that Plaintiff did not give Charlie and Scott Creighton permission to disclose his cancer treatment and diagnosis).)

There are also issues of fact as to whether Plaintiff impliedly consented to the disclosures in the August 16, 2019 Email. On July 9, 2019, Charlie Creighton emailed Plaintiff, copying Scott Creighton, in response to Plaintiff's cancer diagnosis: "So very sorry. Do you plan to update your Associates? Already done it? Want us to do it?" (ECF 97-8, Blackburn Decl. Ex. H.) Plaintiff replied, "I will update my associates when I have [a] plan 'B'[.]" (*Id.*) Whether Plaintiff's message was intended to stop the Creightons from disseminating any information about his diagnosis is ambiguous, especially in light of Plaintiff's subsequent failure to timely object to the 2019 Emails. Specifically, Plaintiff received the 2019 Emails on July 23, 2019; August 16, 2019; September 11, 2019; October 7, 2019; and October 18, 2019 disclosing Plaintiff's cancer diagnosis. But Plaintiff did not object to the disclosure of that information until November 14, 2019—three months after

the August 16, 2019 email—when Plaintiff emailed Scott Creighton, copying Charlie Creighton and Andrew Bergeron regarding the Atlantic Tire Incentive Trip. (PSMF ¶ 22; ECF 97-10, Blackburn Cert. Ex. J.) In that email, Plaintiff took issue with what he viewed as Scott Creighton "using [Plaintiff] as an excuse" to cancel the Incentive Trip, noting that "[m]y health is my private business[.]" (ECF 97-10, Blackburn Cert. Ex. J.) Plaintiff testified that he did not object to the initial email he received on July 23, 2019 because he was "intimidated by the way they [Scott and Charlie] were acting"; he was "embarrassed"; and because "there is a stigma with people who have cancer in the workplace." (ECF 95-4, DeBlasio Cert. Ex. C, Kertesz Dep. Tr., at 151:15-20.)

Based on the foregoing, the Court finds that there is a genuine issue of material fact in dispute related to Plaintiff's invasion of privacy claims against Charlie Creighton and Colony Tire,[13] and Defendants' and Plaintiff's motions for summary judgment as to Counts One and Two are **DENIED**. Because the emails Defendant Scott Creighton sent do not satisfy the publicity requirement for an invasion of privacy claim, *see supra* Section III.A.1, Defendants' motion for summary judgment is **GRANTED** as to Count Three, invasion of privacy, against Scott Creighton. Plaintiff's motion for summary judgment as to Count Three is **DENIED**.

### B. NJLAD Failure to Accommodate (Count Four)

Both Plaintiff and Defendants also move for summary judgment on Plaintiff's claim that Defendants failed to accommodate Plaintiff under the NJLAD. (*See* Defs. Br. at 13-16; Pl. Br. at 17-22.) Plaintiff argues that Defendants violated the NJLAD by failing to make accommodations for Plaintiff's disability, namely his cancer and lymphedema, which occurred as a result of his

---

[13] To the extent that Plaintiff attempts to brings a claim under HIPAA (the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d–1 et seq.) against Defendants, however, "that claim cannot go forward as HIPAA creates no private federal remedy." *Wolf v. New Jersey*, No. 17-2072, 2018 WL 1942502, at *6 (D.N.J. Apr. 23, 2018).

cancer treatments.[14] (Pl. Br. at 18-22; *see also* Pl. Opp. at 13.) In particular, Plaintiff argues that Defendants "refus[ed] to accommodate the Plaintiff's reasonable requests for flexible scheduling and time off for medical treatments[.]" (Pl. Br. at 22.) He also contends that Defendants failed to engage in the interactive process as required under the NJLAD. (*Id.* at 20.) Defendants, conversely, argue that the uncontested record shows that Defendants engaged in the interactive process with Plaintiff despite never receiving a request to do so. (Defs. Br. at 14-16; Defs. Reply at 12.) They further argue that Plaintiff was never denied an accommodation for his cancer treatments and Plaintiff, not Defendants, failed to engage in the interactive process regarding Plaintiff's lymphedema diagnosis. (Defs. Opp. at 16-20.) Finally, Defendants note that Plaintiff testified that the only time he was denied an accommodation for a disability was when he was docked one day of pay for his absence on November 20, 2019 for a doctor's appointment. (Defs. Reply at 12 (citing Kertesz Dep. Tr. at 243:10-22, 244:17-24, 327:19-25, 328:1-11).)

The NJLAD "'requires an employer to reasonably accommodate an employee's handicap.'" *Royster v. New Jersey State Police*, 152 A.3d 900, 910 (N.J. 2017) (quoting *Potente v. County of Hudson*, 900 A.2d 787 (N.J. 2006)). To establish an NJLAD claim for failure to accommodate, a plaintiff must demonstrate that he or she:

> (1) qualifies as an individual with a disability, or [ ] is perceived as having a disability, as that has been defined by statute; (2) is qualified to perform the essential functions of the job, or was performing those essential functions, either with or without reasonable accommodations; and (3) that defendant failed to reasonably accommodate [his or her] disabilities.

*Id.* at 910 (quoting *Victor v. State*, 422, 4 A.3d 126 (N.J. 2010)). "Although these elements do not mirror those of the ADA, the same proofs are implicated[.]" *Id.* To make a *prima facie* case of

---

[14] Defendants accept that Plaintiff is disabled within the meaning of the law solely for purposes of their motion for summary judgment. (Defs. Br. at 13 n.1.)

failure to accommodate, a plaintiff does not need to show that he suffered an adverse employment action. *See Richter v. Oakland Bd. of Educ.*, 252 A.3d 161, 175 (N.J. 2021).

An employee, not employer, must initiate a request for an accommodation. Although the request for an accommodation need not formally invoke the words "reasonable accommodation," the plaintiff must "nonetheless make clear that the employee wants assistance for his or her disability." *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 313 (3d Cir. 1999) (analyzing ADA claim). Once a request for accommodation is made, both parties have a duty to assist in the search for an appropriate reasonable accommodation. *Tynan v. Vicinage 13 of Superior Ct.*, 798 A.2d 648, 657 (N.J. Super. Ct. App. Div. 2002). "[A]n employee cannot refuse to cooperate with an employer's efforts to accommodate his disability and then claim failure to accommodate." *Potente*, 900 A.2d at 792. Additionally, "[a]n employer's duty to accommodate extends only so far as necessary to allow 'a disabled employee to perform the essential functions of his job. It does not require acquiescence to the employee's every demand.'" *Tynan*, 798 A.2d at 655 (quoting *Vande Zande v. State of Wis. Dep't of Admin.,* 851 *F.Supp.* 353, 362 (W.D. Wis. 1994), *aff'd,* 44 F.3d 538 (7th Cir. 1995)).

### 1.  Defendants' Accommodations of Plaintiff After FMLA Leave

The evidence in the record before the Court creates a genuine issue of material fact as to whether Defendants failed to reasonable accommodate Plaintiff for his cancer and lymphedema diagnoses. The Court rejects Plaintiff's broadly worded and unsupported contention that Defendants generally "refus[ed] to accommodate the Plaintiff's reasonable requests for flexible scheduling and time off for medical treatments," but concludes that there are issues of fact as to

19

whether Defendants failed to accommodate Plaintiff after Plaintiff returned from his FMLA leave.[15]

The first issue is whether Defendants met their legal obligations to reasonably accommodate Plaintiff for the doctor's appointment he attended on November 20, 2019. (DSMF ¶ 33.) When asked at his deposition if he had ever been denied an accommodation for a disability, Plaintiff pointed to only November 20, 2019, when he was docked one day of pay because he had to miss one day of work for a medical appointment following his return from FMLA leave.[16] (ECF 95-4, DeBlasio Cert. Ex. C, Kertesz Dep. Tr., at 243:10-22, 327:19-328:11.) The record is unclear as to whether Plaintiff made Colony Tire aware of whether he needed to miss a day of work for his medical appointment. *See Taylor,* 184 F.3d at 313 (employee must make clear that they need assistance for their disability). (*See* ECF 97-14, Blackburn Cert. Ex. N, Ambrose Dep. Tr., at 56:15-60:18 (testifying that it was Plaintiff's responsibility to report time taken off).) While Ambrose told Plaintiff she was unaware of the time Plaintiff had taken off after exhausting his vacation and sick time during his FMLA leave (*see* ECF 95-7, DeBlasio Cert. Ex. Z), Plaintiff stated by email to Ambrose, "[c]laiming that you are 'completely unaware of that time you have taken off thus far' is absurd and a blatant lie." (ECF 95-8, DeBlasio Cert. Ex. AA.)  Based on this record, the Court cannot conclude whether Plaintiff requested an accommodation.

---

[15] Although Plaintiff also argues that "[r]ather than engaging in the legally mandated interactive process, the Defendants coerced the Plaintiff into taking FMLA leave prematurely" (Pl. Opp. at 6; *see also id.* at 12), Plaintiff does not make any citations to the record supporting his argument that Defendants "forced" Plaintiff into taking FMLA leave rather than explore other accommodations. (*Id.* at 12.) Because there is a "complete failure of proof concerning an essential element" of Plaintiff's case, Plaintiff's FMLA leave cannot form the basis of his failure to accommodate claim. *Katz*, 972 F.2d at 55 (quoting *Celotex*, 477 U.S. at 322-23). Further, rather than a failure to accommodate claim, Plaintiff's argument instead appears to advance an "involuntary leave" theory of FMLA interference, which has not been adopted by the Third Circuit. *See Delp v. Hexcel Corp.*, No. 25-00233, 2025 WL 2618766, at *10 (M.D. Pa. Sept. 10, 2025) (collecting cases).

[16] The legality of Colony Tire docking Plaintiff's one day of pay is not at issue. (*See generally* Compl.)

Next, there is also a genuine issue of material fact as to whether Defendants met their obligation to engage in the interactive process regarding potential accommodations for Plaintiff's lymphedema treatment.[17] On November 20, 2019, Plaintiff informed Charlie Creighton, Scott Creighton, Andrew Bergeron, and Adora Ambrose that he would need weekly treatment for his lymphedema, which he planned to have done in North Carolina. (ECF 95-7, DeBlasio Cert. Ex. Z.) Ambrose requested Plaintiff meet with her to discuss a potential accommodation once he returned to work. (*Id.*) Plaintiff informed Ambrose that he would "potentially need…flexibility" in his work schedule to attend weekly appointments but also informed her that he had not scheduled any appointments yet and did not know "what flexibility [may] be needed." (*Id.*) The next day, Plaintiff followed up, stating, "Just wanted to make sure that you received this . [sic] Will this be an issue?" (*Id.*) Ambrose replied that she could not "determine if there will be an issue based on the information [Plaintiff] provided." (*Id.*) She further told him, "[a]s I stated before, please come see me upon your return to Edenton [North Carolina], and we can discuss your accommodation needs further. If you need information before your arrival, please feel free to call me directly." (*Id.*)

The NLAD interactive process "requires employers to make a good faith effort to seek accommodations." *Bertolotti v. AutoZone, Inc.*, 132 F. Supp. 3d 590, 602 (D.N.J. 2015) (citing

---

[17] New Jersey courts and courts in this District have applied a slightly different standard for a *prima facie* case addressing an employer's failure to participate in good faith in the interactive process: "(1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Gould v. New Jersey Dep't of Transp.*, No. 1164-23, 2025 WL 1165847, at *8 (N.J. Super. Ct. App. Div. Apr. 22, 2025) (citing *Tynan*, 798 A.2d at 657); *see also, e.g.*, *Bertolotti v. AutoZone, Inc.*, 132 F. Supp. 3d 590, 601-02 (D.N.J. 2015). Some courts in this District, meanwhile, have analyzed NJLAD and ADA failure to accommodate causes of action as one claim, applying the aforementioned elements to a *prima facie* case. *See, e.g.*, *Hwaga v. RWJ Univ. Hosp.*, No. 17-04125, 2019 WL 13277388, at *5 (D.N.J. Oct. 16, 2019). Under both this standard and *Royster*, 152 A.3d 910, the Court's outcome does not change; there are issues of fact as to whether Defendants and Plaintiff respectively failed to engage in the interactive process and thus whether Defendants failed to provide Plaintiff with reasonable accommodations.

*Taylor,* 184 F.3d at 317). "Employers can show their good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, [and] show some sign of having considered [the] employee's request," among others. *Id.* (quoting *Taylor,* 184 F.3d at 317). Here, the evidence shows that Ambrose did take steps to meet with the Plaintiff about his need for an accommodation. (*See* ECF 95-7, DeBlasio Cert. Ex. Z.) Ambrose also completed a "Record of Interactive Process for Reasonable Accommodation" regarding the exchange, which stated: (1) that "no accommodation [was] specified" by Plaintiff; (2) that she had not received any medical documentation from Plaintiff; and (3) as a result, Plaintiff's accommodation request was "undetermined." (ECF 103-2, Certification of Michael A. Tecza, Ex. C.)

However, it is not clear from the evidence whether the interactive process ever began or if it was stymied by Plaintiff, who never explicitly agreed to meet with Ambrose regarding accommodations for his lymphedema treatment. (*See* ECF 95-7, DeBlasio Cert. Ex. Z.) Further, although this cause of action does not require a showing that Plaintiff suffered an adverse employment action, Colony Tire terminated Plaintiff on November 25, 2019, just five days after he informed the Creightons and Ambrose that he would need an accommodation for lymphedema treatments. (ECF 95-8, DeBlasio Cert. Ex. BB, Termination Letter.) There are issues of fact as to whether this termination was connected to the interactive process such that Plaintiff can argue Defendants cut off the interactive process prematurely, or whether it was entirely unrelated. In particular, there is other evidence suggesting Plaintiff was discharged for reasons separate and apart from his need for accommodations for his lymphedema. (*See, e.g.*, ECF 95-8, DeBlasio Cert. Ex. BB, Termination Letter; ECF 97-9, Blackburn Decl. Ex. I, S. Creighton Dep. Tr. at 43:25-44:6

(testifying that Plaintiff did not correct logistics issues); *id.* at 45:6-10 (testifying that Plaintiff's performance was not as good as his predecessor's); *id.* at 94:11-17, 95:14-96:13 (testifying that Plaintiff's position was based in North Carolina and he was not supposed to work remotely); ECF 97-13, Blackburn Decl. Ex. M, Bergeron Dep. Tr., at 31:18-32:4 (testifying that Plaintiff was terminated because he did not come to the office to discuss "anything" with senior management, including Scott Creighton).)

### 2. Other NJLAD Claims

Plaintiff and Defendants dispute whether this action involves other NJLAD claims in addition to the failure to accommodate claim. (*See* Defs. Opp. at 5-6; Pl. Reply at 6-7.) The Court agrees with Defendants that Plaintiff's case ***does not*** include claims under the NJLAD for (1) retaliation; (2) disability discrimination; (3) wrongful discharge; or (4) any other NJLAD claims other than failure to accommodate (Count Four) and aiding and abetting (Count Five). (*See* Defs. Opp. at 5-6.) Plaintiff's Complaint plainly does not include claims for retaliation or discrimination based on Plaintiff's discharge. "Adding claims to a pleading is properly done by amending the complaint; it is too late to introduce an additional claim at the summary judgment stage." *Tirone v. Trella*, No. 03-257, 2007 WL 3170098, at *6 (D.N.J. Oct. 29, 2007) (citations omitted); *see also Balanced Bridge Funding, LLC v. Mitnick L. Off., LLC*, No. 21- 20512, 2024 WL 3949334, at *5 (D.N.J. Aug. 27, 2024) ("Because plaintiff advances a different cause of action in its motion for summary judgment than that alleged in its amended complaint…I decline to consider plaintiff's new legal theory for the first time at summary judgment."); *St. Martin v. W. Windsor Twp. Police Dep't*, 753 F. Supp. 3d 369, 400–01 (D.N.J. 2024) (quoting *Jones v. Treece*, 774 F. App'x 65, 67 (3d Cir. 2019)) ("As a general matter, a plaintiff 'may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.'") The Court rejects Plaintiff's

attempts to shoehorn these claims in now, when Plaintiff, who is represented by counsel, should have included them at the pleading stage.

### 3. Defendants Charlie Creighton and Scott Creighton

Although there are genuine issues of material fact as to Colony Tire, Plaintiff cannot as a matter of law maintain this cause of action against Defendants Charlie Creighton and Scott Creighton. *See Cicchetti v. Morris Cnty. Sheriff's Off.*, 947 A.2d 626, 645 (N.J. 2008) (citations omitted) ("[T]he plain meaning of the definition of employer in the LAD does not include a supervisor"); *see also Tarr v. Ciasulli*, 853 A.2d 921, 924 (N.J. 2004) (assessing claim against owner of Defendant company pursuant to NJLAD aiding-and-abetting liability).

Based on the foregoing, the Court **DENIES** Plaintiff's motion for summary as to Count Four. The Court further **DENIES** Colony Tire's motion for summary judgment as to Count Four, and **GRANTS** Defendants Charlie Creighton and Scott Creighton's motion for summary judgment as to Count Four.

### C. NJLAD Aiding and Abetting (Count 5)

Defendants and Plaintiff also respectively move for summary judgment on Count 5 of the Complaint, Aiding and Abetting under the NJLAD (N.J. Stat. Ann. 10:5-12(e)) against the individual Defendants Charlie and Scott Creighton. Defendants argue that as the alleged "primary wrongdoers," Scott and Charlie Creighton cannot be liable to Plaintiff for aiding and abetting the wrongful conduct. (Defs. Br. at 17.) Plaintiff argues that he is entitled to summary judgment against the Creightons for aiding and abetting under the NJLAD because the Creightons provided knowing and substantial assistance in violating New Jersey's common law privacy protections and NJLAD violations. (Pl. Br. at 27-33.)

Individuals, including supervisors, may be liable under the NJLAD only insofar as they aid or abet an employer's discrimination, and not for their direct acts. *See Cicchetti*, 947 A.2d at 645 ("[I]ndividual liability of a supervisor for acts of discrimination or for creating or maintaining a hostile environment can only arise through the 'aiding and abetting' mechanism that applies to 'any person.'") (citing N.J. Stat. Ann. § 10:5-12(e)).

To hold an individual defendant liable as an aider or abettor of employment discrimination under the NJLAD, a plaintiff must show that "(1) the employer whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of [his] role as part of an overall illegal or tortious activity at the time that [he] provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation." *O'Shea v. Twp. of Hillside*, No. 20-7027, 2022 WL 17829402, at *5 (D.N.J. Dec. 21, 2022) (citations omitted) (cleaned up).

The Court limits its discussion to whether the Creightons aided and abetted Colony Tire in its potential failure to accommodate Plaintiff under the NJLAD.[18] The Court denies Defendants' and Plaintiff's motions for summary judgment on this cause of action because there are issues of fact as to whether the Creightons were "generally aware of [their] role as part of an overall illegal or tortious activity" and whether they "knowingly and substantially assist the principal violation." *O'Shea*, 2022 WL 17829402, at *5. Moreover, contrary to Defendants' position, "courts both in this district and New Jersey state courts have held that individually named defendants can be held personally liable for their own conduct under the aiding and abetting provision of the NJLAD."

---

[18] As discussed in Section III.B.2, *supra*, claims for retaliation and discrimination against Colony Tire are not a part of this lawsuit and so the Court also does not consider liability for aiding and abetting those violations. Additionally, it is unlawful under the NJLAD "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts **forbidden under this act**, or to attempt to do so." N.J. Stat. Ann. 10:5-12(e) (emphasis added). Common law invasion of privacy does not arise under the NJLAD and therefore the Creightons cannot be held liable for aiding and abetting alleged common law privacy violations pursuant to N.J. Stat. Ann. 10:5-12(e).

*Johnson v. Glob. Equip. Co., Inc.*, No. 24-08789, 2025 WL 2654995, at *3 (D.N.J. Sept. 17, 2025) (citations omitted).

There are genuine issues of material fact as to whether the Creightons aided or abetted Colony Tire in failing to accommodate Plaintiff after he returned from FMLA leave, specifically as to time off that Plaintiff may have needed for his doctor's appointment on November 20, 2019, and for his subsequent doctor's appointments for lymphedema treatment. For example, Charlie Creighton testified that Plaintiff would be responsible for informing Ambrose that he needed to take time off work. (ECF 97-12, Blackburn Cert. Ex. L, C. Creighton Dep. Tr., at 52:6-11.) However, in Plaintiff's November 20, 2019 email to Charlie Creighton, Scott Creighton, and Andrew Bergeron, he informed them of his lymphedema diagnosis and that while it "does [not] impact my ability to work," the diagnosis "requires that I receive weekly treatment." (ECF 95-7, DeBlasio Cert. Ex. Z.) Further, Charlie Creighton testified that he "probably" spoke to Ambrose about the November 24, 2019 email chain with the subject line "Pay" (DeBlasio Cert. Ex. AA). (ECF 97-12, Blackburn Cert. Ex. L, C. Creighton Dep. Tr., at 60:11-20.) But although Charlie Creighton and Ambrose may have been in touch about Plaintiff's complaints—made the day before Colony Tire terminated him—Ambrose testified that she did not assist Charlie Creighton in drafting Plaintiff's Termination Letter. (ECF 97-14, Blackburn Cert. Ex. N, Ambrose Dep. Tr., at 79:13-15.) Finally, Charlie Creighton testified that he, Andrew Bergeron, and Scott Creighton made the decision to terminate Plaintiff, a decision made days after Plaintiff informed them that he needed treatment for lymphedema. (ECF 97-12, Blackburn Cert. Ex. L, C. Creighton Dep. Tr. at 39:14-16.)

Based on this evidence, the Court concludes that the facts are contested as to the Creightons' notice of and involvement in Plaintiff's request for accommodations and whether they

26

aided and abetted in denying Plaintiff reasonable accommodations, should a factfinder find that Colony Tire is liable.  Therefore, Defendants' and Plaintiff's motions for summary judgment as to Count Five are **DENIED.**

### <u>CONCLUSION</u>

For the reasons stated above, Defendant's motion for summary judgment (ECF 95) is **GRANTED** in part and **DENIED** in part.  Plaintiff's motion for summary judgment (ECF 96) is **DENIED**. An appropriate order follows.

*/s/ Jamel K. Semper*
**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig:  Clerk
cc:     James B. Clark, U.S.M.J.
        Parties